NO. 12-16001-EE

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

UNITED STATES OF AMERICA,
                    *Plaintiff/appellee,*
        v.

DOUGLAS NEWTON,
                    *Defendant/appellant.*

On Appeal from the United States District Court
for the Southern District of Florida

BRIEF OF THE APPELLANT
DOUGLAS NEWTON

MICHAEL CARUSO
 Federal Public Defender
TRACY DREISPUL
 Assistant Federal Public Defender
 Attorney for Appellant Douglas Newton
 150 West Flagler Street, Suite 1500
 Miami, Florida 33130-1555
 Telephone No. (305) 536-6900

THIS CASE IS ENTITLED TO PREFERENCE
(CRIMINAL APPEAL)

**CERTIFICATE OF INTERESTED PERSONS
AND CORPORATE DISCLOSURE STATEMENT**

**United States v. Douglas Newton
Case No. 12-16001-EE**

Appellant, Douglas Newton, files this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

Caridad, Miguel, Assistant Federal Public Defender

Caruso, Michael, Federal Public Defender

Cooke, Marcia G., United States District Judge

Davidson, H. Ron, Assistant United States Attorney

Dreispul, Tracy, Assistant Federal Public Defender

Ferrer, Wifredo, United States Attorney

Goodman, Jonathan, United States Magistrate Judge

Newton, Douglas, Appellant/Defendant

Palermo, Peter R., United States Magistrate Judge

Schultz, Anne R., Assistant United States Attorney

Soto, A. Cristina Perez, Assistant United States Attorney

## STATEMENT REGARDING ORAL ARGUMENT

The defendant requests oral argument.  This appeal stems from a six-day criminal trial alleging mail fraud, securities fraud, and conspiracy.  This appeal raises complex questions of law and fact with respect to both trial and sentencing.  The record is complex, spanning six days of trial as well as numerous documents and transcripts of recorded meetings and conversations.  It is respectfully submitted that oral argument will materially aid in the decisional process and is necessary to the just resolution of the appeal.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS. . . . . . . . . . . . . . . . . . . . . . . . . C-1

STATEMENT REGARDING ORAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CITATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF SUBJECT-MATTER AND APPELLATE JURISDICTION. . 1

STATEMENT OF THE ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      Course of Proceedings and Disposition

         in the District Court. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

      Statement of Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

      Standards of Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

SUMMARY OF THE ARGUMENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARGUMENTS AND CITATIONS OF AUTHORITY. . . . . . . . . . . . . . . . . . 25

I.    The court erred by refusing to consider the market value of the securities
in assessing loss and by holding Mr. Newton accountable for a
transaction with respect to which he had "no agreement.". . . . . . . . . . . . 25

    A.    The court failed to make a reasonable estimate of loss based on
the available information. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

B.    The district court applied an invalid theory of loss.. . . . . . . . . . . . . 27

C.    Mr. Newton had no agreement with respect to Skwara's second

transaction.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

II.    The court erred by imposing a position of trust enhancement where Mr.

Newton had no relationship with the victims.. . . . . . . . . . . . . . . . . . . . . . 30

III.    Mr. Newton's convictions must be vacated because the government

failed to prove the offenses charged in the indictment and encouraged

the jury to convict on alternate grounds.. . . . . . . . . . . . . . . . . . . . . . . . . . 32

A.    There was no evidence Newton sought to induce an artificially

inflated price.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

B.    The was no material misrepresentation.. . . . . . . . . . . . . . . . . . . . . 35

C.    The prosecutor's comments constructively amended the

indictment... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

1.    The government urged the jury to convict based on an

uncharged honest services theory.. . . . . . . . . . . . . . . . . . . . . 37

2.    The prosecutor told the jury the indictment offered "just a

flavor" of the fraud.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

IV.   Mr. Newton's conviction on count seven must be set aside because the

sole coconspirator testified that he had no agreement with Mr. Newton

regarding that transaction... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

V.    The cumulative effect of trial errors deprived Mr. Newton of a

fair trial.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

A.    The court abused its discretion by allowing hearsay... . . . . . . . . . . 45

B.    The trial prosecutor used Mr. Skwara's guilty plea as substantive

evidence of Mr. Newton's guilt.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

C.    The court plainly erred in failing to give a limiting instruction.. . . . 51

D.    The combined effect of these errors warrants a new trial.. . . . . . . . . 53

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

CERTIFICATE OF COMPLIANCE.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

# TABLE OF CITATIONS

**CASES:**

*McNally v. United States*,

     483 U.S. 350, 107 S. Ct. 2875 (1987).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

*Pinkerton v. United States*,

     382 U.S. 640, 66 S. Ct. 1180 (1946).. . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*Skilling  v. United States,* — U.S. —,

     130 S. Ct. 2896 (2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

\*  *United States v. Baker*,

     432 F.3d 1189 (11th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 45

*United States v. Barakat*,

     130 F.3d 1448 (11th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

*United States v. Behety*,

     32 F.3d 503 (11th Cir. 1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Borchardt*,

     698 F.2d 697 (5th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. Boyd*,

     131 F.3d 951 (11th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Castro*,

    89 F.3d 1443 (11th Cir. 1996). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*United States v. Chilcote*,

    724 F.2d 1498 (11th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Conover*,

    845 F.2d 266 (11th Cir. 1988). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. De La Vega*,

    913 F.2d 861 (11th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50

*United States v. deVegter*,

    198 F.1324 (11th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*United States v. Edwards*,

    716 F.2d 822 (11th Cir. 1983). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*United States v. Gari*,

    572 F.3d 1352 (11th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

\* *United States v. Garrison*,

    133 F.3d 831 (11th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 31

\* *United States v. Ghertler*,

    605 F.3d 1256 (11th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

*United States v. Griffin*,

    778 F.2d 707 (11th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 51

*United States v. Hall*,

    349 F.3d 1320 (11th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

*United States v. Hands*,

    184 F.3d 1322 (11th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

*United States v. Hernandez*,

    921 F.2d 1569 (11th Cir. 1991). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Hunter*,

    323 F.3d 1314 (11th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*United States v. Johnson*,

    730 F.2d 683 (11th Cir. 1984). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

*United States v. Keller,*

    916 F.2d 628 (11th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. King*,

    505 F.2d 602 (5th Cir. 1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Marshall*,

    173 F.3d 1312 (11th Cir. 1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

\*  *United States v. Medina*,

   485 F.3d 1291 (11th Cir. 2007). . . . . . . . . . . . . . . . . . . . . . . 19, 26, 28, 29, 39

\*  *United States v. Mitchell*,

   1 F.3d 235 (4th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 51

*United States v. Olis*,

   492 F.3d 450 (5th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Rahim*,

   431 F.3d 753 (11th Cir. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*United States v. Smith*,

   893 F.2d 1269 (11th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*United States v. Snyder*,

   291 F.3d 1291 (11th Cir. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28

\*  *United States v. Tapia,*

   761 F.2d 1488 (11th Cir. 1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 36

*United States v. Tatum*,

   138 F.3d 1344 (11th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27, 28

*United States v. Vigliatura*,

   878 F.2d 1346 (11th Cir. 1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

*United States v. Wetherald*,

    636 F.3d 1315 (11th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

*United Techs. Corp. v. Mazur*,

    556 F.3d 1260 (11th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

**STATUTORY AND OTHER AUTHORITY:**

15 U.S.C. § 78ff(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

15 U.S.C. § 78j(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

17 C.F.R. § 240.10b-5. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 2. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 371. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

18 U.S.C. § 1341. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 37, 39

18 U.S.C. § 1346. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 37, 39

18 U.S.C. § 3231. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

18 U.S.C. § 3742. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. Crim. P. 29. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Fed. R. Crim. P. 33. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Fed. R. Evid. 404(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

Fed. R. Evid. 807. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Fed. R. Evid. 807(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

Fed. R. Evid. 807(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

U.S.S.G. § 2B1.1, comment. (n.3((E)(i)). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

U.S.S.G. § 2B1.1, comment. (n.3(C)). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

U.S.S.G. § 2B1.1, comment. (n.3A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

U.S.S.G. § 2B1.1(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

U.S.S.G. § 3B1.3. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 32

## STATEMENT OF SUBJECT-MATTER AND
## APPELLATE JURISDICTION

The district court had jurisdiction under 18 U.S.C. § 3231 because the defendant was charged with offenses against the laws of the United States. This Court has jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742, which grant courts of appeals jurisdiction over final decisions and sentences. The notice of appeal was timely filed on November 20, 2012, [DE202], from the judgment and amended judgment entered on November 9, and 15, 2012. DE200, 201.

1

## STATEMENT OF THE ISSUES

### I.

Whether the court erred by refusing to consider the market value of the securities in assessing loss and by holding Mr. Newton accountable for a transaction with respect to which he had no agreement.

### II.

Whether the court erred by imposing a position of trust enhancement where Mr. Newton had no relationship with the victims.

### III.

Whether Mr. Newton's convictions must be vacated because the government failed to prove the offenses charged in the indictment and encouraged the jury to convict on alternate grounds.

### IV.

Whether Mr. Newton's conviction on count seven must be vacated because the sole coconspirator testified that he had no agreement with Mr. Newton regarding that transaction.

### V.

Whether the cumulative effect of trial errors deprived Mr. Newton of a fair trial.

2

## STATEMENT OF THE CASE

The appellant was the defendant in the district court and will be referred to by name.  The appellee will be referred to as the government.  The record will identified by the document entry ["DE"] and page number of the Record on Appeal.  The appellant is incarcerated.

## Introduction

This case arises from a sting operation.  The indictment alleged that Mr. Newton, acting alone and in concert with a coconspirator, paid kickbacks in order to induce a fictitious pension fund to purchase stock in their companies at artificially inflated prices.  DE19.  At trial, the government alleged that the stock prices were inflated because the fund purchased restricted stock at the market prices for free-trading stock.  The errors in this appeal relate primarily to the government's failure to prove at trial, and the district court's refusal to consider at sentencing, the actual value of the restricted stock.

## Course of Proceedings and Disposition in the District Court

Douglas Newton was charged by second superseding indictment with mail fraud, securities fraud, and conspiracy.  DE19. Counts 1 and 2 alleged that Mr. Newton knowingly and with intent to defraud, devised a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent

3

pretenses, and that, in furtherance of said scheme, "did knowingly cause to be delivered certain mail matter by a private carrier," in violation of 18 U.S.C. § 1341 and 2 (mail fraud).  Counts three and four alleged that Mr. Newton knowingly, willfully, and unlawfully, employed a device, scheme, and artifice to defraud in connection with the purchase and sale of securities, in violation of 15 U.S.C. § 78j(b), 15 U.S.C. § 78ff(a), 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2 (securities fraud). Count 5 alleged conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371.  Counts 6 and 7 alleged securities fraud, in violation of  15 U.S.C. § 78j(b), 15 U.S.C. § 78ff(a), 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2.

Mr. Newton was convicted on all counts [DE138] and was sentenced to 30 months' imprisonment followed by one year of supervised release. DE201. This appeal follows.

## Statement of Facts

Douglas Newton was the Director, Chief Executive Officer, and primary shareholder of Real American Brands,  Inc. ("RLAB").  G.Ex.2A:5.  Prior to the events in this case, Mr. Newton had been acquainted with Robert Epstein,  who was a "cooperating witness," and targeted Newton for the sting operation herein.  *See* DE218:72; DE74.

4

"The scheme," as described by FBI Agent Robert Strickland, was for Strickland to pose as "Rob Scott," who held a close personal relationship with the trustee of a pension fund for a national retail chain. DE218:62. Strickland proposed to Newton that, in exchange for a kickback, the trustee could arrange to have the pension fund purchase stock in RLAB. DE 218:62-63. Strickland told Newton that they had carved a niche out of the fund where they had the opportunity to "dabble," or bring "nontraditional opportunities" to the fund. G.Ex.2A:8. "[T]hey have funds available or, or set aside where we actually enter into deals, be it through free trading stock, or restricted stock." G.Ex.2A:9.

If the fund were to purchase stock, Newton would be required to pay a thirty-percent kickback to a shell corporation. G.Ex.2A:9-11. For every twenty thousand dollars the pension fund gave Newton, Epstein wanted five thousand dollars in stock. G.Ex.2A:25.

"[T]he market determined the price." DE220:37 (testimony of Agent Strickland). When Mr. Newton first asked whether the transaction would be tied to the market price. Strickland responded, "No . . . the price is really irrelevant to them." G.Ex.2A:16. He continued: " . . . where it comes into play is, whether they but it through the market, or whether . . . it's a restricted deal." G.Ex.2A:17. The FBI determined that the price would be at the "ask." DE220:38; G.Ex.2A:26. Newton

5

stated that the stock was showing "[l]ike 003 by 005." Strickland stated, "Then that's what it is." G.Ex.2A:26. Newton asked, "So we would do it at 003?" G.Ex.2A:27. Epstein responded, "5." G.Ex.2A:27. Strickland confirmed, " . . . at the offer." G.Ex.2:27. Strickland stated that they would sign a new subscription agreement every time they did a deal, in case the stock price moved. "That's the importance of having . . . at the offer." G.Ex.2A:27.

They called the purported trustee, "Chris Russo," on the phone. Russo stated that he had looked at RLAB's trade history and found it was "really thin." G.Ex.2A:44. Russo asked Mr. Newton whether he had restricted stock to sell. Mr. Newton replied that he could issue four million shares immediately. Russo replied, "that's the way we can go then." Gov.Ex2A:45. *See also* DE222:35 (Strickland's testimony that the deal was for restricted shares "because of the share price and how thinly it was traded. If we were to move forward, it would only be a restricted transaction.").

The following day the pension fund transferred $20,000 to RLAB, in exchange for the sale of 4,000,000 restricted shares of RLAB common stock. *See* DE219:24-25. That same day, Mr. Newton sent, via Federal Express, a check for $6,000 to "Great Lake Advisors," the fake consulting firm. DE225:61-66. A second subscription agreement was executed on April 7, 2009, for 2,222,222 shares of

6

common stock at .009 a share, or $20,000.   DE219:239-42.  A $6,000 cashier's check dated April 8, 2009 was sent to Great Lake Advisors.   DE219:41-42. DE225:75.

Strickland was "the face" of Great Lakes Advisors.  DE219:27. Mr. Newton sent a series of e-mails to Agent Strickland referencing purported conversations about his company.   Strickland testified that no actual consulting services were provided. DE219:27-51.

On April 29, Strickland told Newton that Russo was concerned with getting caught and there would be no more deals, at least for six to eight weeks.  *See* G.Ex.13A.  Newton asked whether Russo would be interested in doing business with another public company.   G.Ex.13A:10.

Yan Skwara had been the president and CEO of U.S. Farms, Incorporated ("USFM") a "publicly-held farming and nursery company specializing in aloe vera products." DE220:120.  USFM  Farms had common stock that was publicly traded in the over-the-counter market on pink sheets.  DE220:122.[1]

Skwara testified that because USFM was publicly traded, an investor could "go online or through their stockbroker and purchase shares."  DE220:124.  Investors

---

[1]Unlike RLAB, which was non-reporting, G.Ex.2A:38, USFM was a reporting company; its financial statements were filed on a quarterly basis with the Securities and Exchange Commission.  DE 220:123.

could also purchase "restricted shares directly from the company, which are restricted for sale for a two-year period." DE20:124. Mr. Skwara testified that "[t]he freely tradeable shares are more valuable because they have the ability to be liquidated immediately." DE220:124. By contrast, if someone purchased restricted stock, after the two-year holding period, that investor would need to obtain a legal opinion and file paperwork in order to swap the restricted certificates for freely-tradeable shares. Skwara testified that when he sold restricted stock in the past, the price of the restricted stock would be at a discount to the market price because of the two-year holding period. DE220:125-26.

One day Mr. Skwara received a call from Mr. Newton, indicating that he had a relationship with a group in Florida that was involved with a pension fund, and that it could be an opportunity for USFM to make a presentation and possibly have the fund invest in USFM DE220:129. Newton told Skwara about the kickback and the consulting agreement, and that there would be no bona fide consulting. Skwara was supposed to pay Mr. Newton $6,000 for bringing the fund to USFM. DE220:129-31.

Mr. Skwara flew to Florida and met with Mr. Epstein and Agent Strickland. Skwara talked briefly about his company, "but the conversation slowly shifted to the real reason for the meeting," which was "that some of the individuals in the room would benefit from a kickback." DE220:135-36. Skwara agreed. Skwara conducted

8

one transaction in June and one in July of 2009. DE225:53. The deals were worth $20,000 each. "And in return, Mr. Skwara paid [Agent Strickland], through the consulting company, a 30 percent kickback, total of $6,000 per transaction. And then the shares that were sold by Mr. Skwara to the fund were mailed to the fictitious fund's address." DE220:12. Strickland never did any consulting for Skwara or USFM. DE220:12.

After the first deal, Skwara sent Newton four separate checks totaling $6,000. DE220:56-61; G.Ex.63A. Mr. Skwara did not make any payments to Mr. Newton for the second transaction. Skwara testified that he paid Newton for the first transaction "because the monies were available and that was the agreement I had with him." DE220:163. Skwara testified that he "did not have any agreement on the second transaction." DE220:163.

Mr. Skwara testified that he pled guilty to conspiracy to commit securities fraud and his plea agreement was entered into evidence. DE220:163; G.Ex.43. Skwara testified that he pled guilty because he "wanted the truth to be known," that he participated in a conspiracy to commit securities fraud with Mr. Newton. DE220:171.

9

During the trial, Agent Strickland was asked about the meaning of the term "pump and dump." DE219:57. In response to a foundation objection, Agent Strickland testified as to his familiarity with the term.

> In specifically working with this operation and speaking with experienced agents, such as the case agent in this matter. These cases revolved around companies that were involved in pump and dump –

DE219:58.

Mr. Newton moved for a mistrial because the testimony suggested that Newton's company was involved with pump and dump schemes. DE219:59-60. The court instructed the jury to disregard the statement. DE219:62.

Strickland defined the term "pump and dump:" "[i]t means someone who attempts to drive the price of a stock up to a certain level and then sell it immediately or once it hits a certain price point . . . It's done to make money." DE219:63. The term "push," in the context of stock, means to help move the price up. DE219:63.

On the last day of the trial, case Agent Michael Sputo testified with respect to RLAB's bank records, G.Ex.63. DE225:95. Checks from April, May, and June 2009 were paid to "Springs Homeowners" or "Springs Association," for $755 each. Over a hearsay objection, Agent Sputo testified that he learned that this was the "homeowners['] association that covers 37 Lafayette, Rancho Mirage," the address listed on Mr. Newton's driver's license. DE225:96-103. Agent Sputo learned this by

10

calling and speaking to "somebody on the phone there." DE225:122. "And then I asked them if 37 Lafayette was one of the properties that that homeowners association covered . . . [a]nd they said yes." DE225:122. Sputo did no investigation as to whether Mr. Newton worked at that condominium association that was his home, or whether he kept business records in his office in that condominium. DE225:123.

Checks from May and June 2009 were made out to Braun Real Estate. DE225:103,112. Over objection, Agent Sputo testified that, through checking a "law enforcement database that . . . accumulates utility bills and other records into one database," he learned that Mr. Newton's son lived at the relevant address. DE225:103,109,116. The underlying records had not been introduced into evidence. DE225:117. Agent Sputo had not investigated whether any business assets were stored at the apartment or whether Mr. Newton's son ever worked for his father, although he believed, "from looking at that press release, that he had some affiliation with the company." DE225:118-19.

A check was made out to "Morningside" for $6,244.07. The deposit stamp said "The Club at Morningside." DE225:106. Over objection, Agent Sputo testified that Morningside is "a private golf and tennis country club in Rancho Mirage, California." DE225:106. Sputo "found out that it was a private country club, it was a members only club, and that the account number at the bottom of the check was Mr.

Newton's account number." DE225:119-20. Sputo learned this first by "look[ing] online" to see "what the club was." Then he called, and someone told him that it was a private club. DE225:120. Sputo did no investigation as to whether Mr. Newton ever conducted business at the club. DE225:121.

Agent Sputo testified that he had learned this information the day before his testimony. DE225:122 Checks were additionally made out to the gas company, Southern California Edison, and Time Warner Cable. DE225:104-05.

After Agent Sputo's direct testimony, Mr. Newton reiterated objections to the testimony that Morningside Club was a private club, that the Braun Real Estate has to do with payment for his son's apartment, and that Springs Homeowners Association had to do with paying for his condominium. He argued that the evidence had caught him by surprise because he had been led to believe that the evidence would only be used to show his control over the account. The court found there was no unfair surprise. The court had previously addressed the hearsay issue and considered the objection recognized and preserved. DE225:11225:4.

At the close of the government's evidence, Mr. Newton moved for judgment of acquittal pursuant to Fed. R. Crim. P. 29. DE225:153. The motion was denied. DE225:154. Mr. Newton entered documents into evidence, but did not call any witnesses. DE225:167-70.

12

Mr. Newton's closing argument raised two defenses. First, he argued that indictment specifically and repeatedly alleged that Mr. Newton sought to induce the fund to pay an artificially inflated price for the stock, but the government had failed to provide any evidence of that. Second, Mr. Newton argued that all of his statements and conduct showed that he believed in the legitimacy of his company, he believed it was ultimately a good investment, and he never intended to harm the pension fund. DE222:49-81.

In its closing and rebuttal closing, the government used the evidence that Newton challenged as hearsay to argue that Mr. Newton committed fraud because he wanted to continue living a luxury lifestyle. *See* DE222:22,23,24,31,93,94,96. The prosecutor criticized defense counsel for focusing "only on the inflated price language" and argued that the indictment offered "just a general description" of the crime. DE222:84-85. The prosecutor argued, "the kickback and the concealment" was "what this case is about." DE222:84.

Mr. Newton was convicted on all counts. He subsequently filed a motion for a new trial pursuant to Fed. R. Crim. P. 33, based on the hearsay and unfair surprise. DE150. The court orally denied the motion at the beginning of the sentencing hearing. DE205:9-10.

**The Sentencing Hearing**

According to the Pre-Sentence Investigation Report ("PSI"), the base offense level for Mr. Newton's offense, pursuant to U.S.S.G. § 2B1.1(a)(1), was 7. There was no actual loss in this case. *See* PSI ¶¶ 18, 21. The PSI added an eight-level increase levels based on the finding that the "intended pecuniary loss" was between $70,000 and $120,000, based on the total $80,000 invested by the fund. *See* PSI ¶ 26. The PSI assessed a two-level increase, over objection, based on "sophisticated means." PSI ¶ 27. The government also sought a two-level role enhancement, which was denied. *See* DE205:12; 205:43.

Mr. Newton argued that there was no loss because had the fund attempted to buy this many shares on the free market, it would have driven up the price, so they would have ended up paying much more than $20,000 for the shares. *See* 205:13-14. *See also* DE187:16 (arguing that the market value of the USFM and RLAB stock combined was greater than the $80,000 invested).

The government argued that this deal should never have happened because it was a bad deal for the pension fund. The Government acknowledged, however, that the fund "did get something in return, and if we want to sort of be generous to the defendant, there could be a credit against the loss of the shares we received." DE205:19. The government argued that "as a general rule of number, the restricted

14

shares we got were about worth half of the amount of free trading shares." DE205:19.

In their filings regarding the PSI objections, both parties addressed the testimony of Professor Halper[t], who had testified as a government expert in a separate case.  *See* DE178; 187.  Mr. Newton attached an excerpt of Professor Halpert's testimony to a pleading, and noted Halpert's opinion was that restricted stock can sell at a discount of between 10 and 50%.  DE187:4; DE181-1:3.  Halpert also testified that restricted stock is not always sold at a discount, and a buyer might pay the market price, or even a premium, if he wanted a large block of restricted shares that was unavailable without causing a spike in the market price. *See* DE181-1:7-10.

Mr. Newton also attached the testimony of Professor Steve Thel, who testified in a different case, that there are circumstances where restricted shares are just as valuable as shares bought on the market, "or even more valuable."  DE187-2:6.  Professor Thel testified that if a buyer was going to "be a substantial holder, free tradeable stock doesn't matter that much."  DE187-2:6.  Professor Thel also testified that, "if you want to buy a lot of stock in a thinly traded market, your purchases are going to drive up the price. . . You might be happy to take restricted stock at the existing market price because it's just as good, and if you tried to buy in the market

it would drive the price much higher." DE187:2-6. Professor Thel testified that in a thinly traded market, it could even be a "tremendous bargain" to obtain a large numbers (25 to 30% of the total shares available) of restricted stock at numbers of restricted stock at market prices. DE187:10-11.

The government alternatively argued that the intended loss was $24,000, the amount of the kickback, based on the $6,000 kickback paid in each transaction. DE205:19. Mr. Newton had argued in his written pleadings that this was an inappropriate calculation and there was no evidence that Newton knew about or was involved with Skwara's second deal. DE187:12-15.

The government had an expert present would could have testified about how to calculate the loss amount. DE205:20. The court stated, " Well, I don't think I have a doubt about how it should be calculated." The court believed that, because there was "no reason for this stock to have been purchased in the first place," the entire purchase price was the loss amount. DE205:20.

Mr. Newton argued that the court was required to offset that amount by whatever the victims received. DE205:21. The court disagreed. The court analogized the stock to a stolen painting. It had intrinsic value, but there was no market for it, so there was no value the court could receive for the painting. DE205:25.

Mr. Newton asked to allow his expert, Steve Pomerantz, Ph.D., to proffer testimony. After his first substantive question regarding the facts of this case, however, the government objected.  The government was permitted to *voir dire* the witness and asked, hypothetically, "if there was a pump and dump going on and that was not disclosed to the market, would you say that you value the market price of a penny stock as evidence of the company's valuation?"  DE205:32.  Dr. Pomerantz replied, "I would agree with that.  I mean, Enron is an example of stock that goes to zero overnight because of undisclosed fraudulent information." DE205:32.

The prosecutor moved to strike the testimony.  The prosecutor argued that there was "no relevance to what the market price was showing when we acknowledged the market price did not reflect the kickback and the illegal scheme that was going on." DE205:35.   The court seemed to agree that the market price was irrelevant. DE205:35-36 ("This witness is saying all I did to determine the market price was look at the market price. . . . But that's not what happened, and that's not why the stock has value.  .  .  . If I had been holding Enron stock on Monday, this witness would have said, on the Tuesday, the fraud is announced, it's worthless; it doesn't matter - and that's essentially what this pension fund had.  Once anybody knew at the time of the restrictive nature of the stock is off, the stock is worthless").

17

Defense counsel summarized Dr. Pomerantz' proposed testimony for the record:

> what Dr. Pomerantz would have testified to is that – like I explained before, the market price of this stock was .005. For the fund to buy four million shares of free trading stock at that price, given the lowly liquidity, it would have driven the price through the roof, and they would not have been able to buy these many shares for $20,000. Instead, what a reasonable buyer would do is take restricted shares, even though they are restricted, because you can buy them all at once, so the discount is offset by the fact that you pay have to pay a premium because you are buying all the shares at once. When you take all that into account, they got a fair price for that stock, and the discount of a restricted stock varies all the way from fifty percent to ten percent. And in some instances, as a study presented by the Government yesterday in its pleadings show, sometimes you have to pay a premium for that. You have to pay a premium for restricted stocks.

DE205:38.

The prosecutor suggested that Mr. Newton could have Dr. Pomerantz submit an affidavit after the hearing and the court agreed to allow that. DE205:36-37. The affidavit, subsequently submitted by Dr. Pomerantz, states that he would have testified that the fund suffered no economic loss. DE215-1.[2]

---

[2]The affidavit states, in relevant part:

Specifically as to RLAB, the fund purchased $40,000 worth of restricted stock in both RLAB and US Farms at the market price [f]or free trading shares. Because shares in RLAB were very thinly traded, had the fund sought the buy such a large block of free trading shares in the open market it would have had to approach numerous brokers to acquire a portion of this large block. The first purchase would drive up the price

Finally, the government sought an abuse of trust enhancement. Mr. Newton objected because his shareholders were not victims of this offense. DE205:58. The court ruled that "when you have a CEO that commits a crime that is related to the actual company, that's an abuse of trust." DE205:60.

The court sentenced Mr. Newton to 30 months' imprisonment, the low-end of his calculated guidelines range. DE205:83.

## Standards of Review

I. "The interpretation of the sentencing guidelines is a question of law that is reviewed *de novo*. . . . However, the amount of loss determination at sentencing is reviewed for clear error." *United States v. Medina*, 485 F.3d 1291, 1297 (11th Cir. 2007) (citations omitted).

II. This Court reviews for clear error a district court's factual determination that a defendant abused a position of public trust, but will review *de novo* the district

---

of the stock due to the law supply and demand. The second purchase would do the same and so on until the fund acquired the entire the entire 6, 222,222 shares. In the end the fund would have to pay more for the entire block of stock than the initial free trading price for each share. In such a situation the fund might reasonably purchase all 6,222,222 of restricted shares at the free trading share market price.

DE215-1.

court's legal conclusion that the defendant's conduct justified the enhancement. *See United States v. Garrison*, 133 F.3d 831 (11th Cir. 1998).

III & IV.    This Court reviews a preserved motion for judgment of acquittal based on insufficient evidence *de novo*. *United States v. Rahim*, 431 F.3d 753, 756 (11th Cir. 2005). If the Court finds the error is not preserved, it is reviewed for manifest injustice. *Id*. "To uphold a conviction, in the absence of any evidence as to an essential element, would be a 'miscarriage of justice.'" *United States v. Tapia,* 761 F.2d 1488, 1492 (11th Cir. 1985).

A constructive amendment of the indictment is error *"per se* reversible error." *United States v. Keller,* 916 F.2d 628 (11th Cir. 1990).

V.    Preserved evidentiary challenges are reviewed "for clear abuse of discretion." *United States v. Gari*, 572 F.3d 1352, 1360 (11th Cir. 2009) (quotation omitted). "A district court abuses its discretion when it makes an error of law." *Id*. (quotation omitted).

Improper prosecutorial remarks during closing argument warrant reversal if improper and prejudicial to the substantial rights of the defendant. *See United States v. Boyd*, 131 F.3d 951, 955 (11th Cir. 1997).

In reviewing a claim of cumulative error, the Court will "review the prejudicial effect of all evidentiary errors, evaluated under both preserved and plain error

20

standards, in the aggregate," and will reverse "if the cumulative effect of the errors is prejudicial, even if the prejudice caused by each individual error was harmless." *See United States v. Baker*, 432 F.3d 1189, 1203 (11th Cir. 2005) (citations omitted).

## SUMMARY OF THE ARGUMENTS

I.      Mr. Newton's sentence must be vacated because the district court refused to consider the market value of the stock sold to the pension fund. There was no actual loss in this case. However, the government's theory was that the pension fund overpaid for the stock because it received restricted stock at the market price for free-trading stock. Both Mr. Newton and the government had experts available to assist the court in making a reasonable estimate of loss based on this theory. The district court misapplied the guidelines by refusing to consider this evidence and make a reasonable estimate of loss.

The court further erred as a matter of law by ruling that the stock was worthless because the transaction should never have occurred, and because the stock could have lost value if the fraud had become known. Both the guidelines and the law of this Circuit make clear that fraud in an inducement does not transform the entire gross value of a transaction into loss, and courts must not increase a defendant's sentence based on speculation. Additionally, the court should not have held Newton

21

accountable for the second transaction committed by Yan Skwara, because Skwara testified that transaction was not part of his agreement with Newton.

II.    The court erred in applying an abuse of position of trust enhancement where Mr. Newton had no relationship of trust with the purported victims of the offense.  The court's bright-line rule – that the enhancement applies any time a CEO commits a fraud involving his company – is contrary both to the guidelines and the law of this Circuit.  A defendant's position of authority is not sufficient to warrant the enhancement, where that position did not create an actual trust relationship with respect to the victims of the offense.  Furthermore, the abuse of trust must significantly enhance facilitates the offense of conviction.  Newton's status as CEO was not enough.  The enhancement was further error because it was based on no more than the conduct that constitute the base offense.

III.    Mr. Newton's convictions must be vacated because the government failed to prove the offenses charged in the indictment and encouraged the jury to convict on alternate grounds.  The indictment specifically and repeatedly alleged that Newton and Skwara induced the fund to purchase stock at artificially inflated prices.  Despite having an expert available, the government offered no evidence that the stock price was inflated.  The government thus failed to prove the conspiracy charged in the indictment.

22

Lacking tangible evidence that the fund overpaid, the government encouraged the jury to convict based on the kickback and the cover-up. The prosecutor even criticized defense counsel for focusing only on the inflated price language. However, Mr. Newton was not charged merely with paying a kickback or under any "honest services" theory of fraud. Rather, the government was required to show that he deceived the pension fund out of actual money or property.

The prosecutor also argued that the indictment merely offered a "flavor" or "general description" of the fraud. This argument was followed by a list of allegations of misconduct that were at best tangentially related to the conspiracy charged in the indictment. In context, the government's closing argument constructively amended the indictment was reversible error *per se*.

IV.    Mr. Newton's conviction on count seven must be vacated because it is based on conduct committed by Yan Skwara, and Skwara testified that he had no agreement with Newton with respect to that count.

V.    Finally, the cumulative effect of trial errors deprived Mr. Newton of a fair trial. The district court clearly abused its discretion by admitting hearsay testimony that the government then used to portray Newton as a greedy man who committed fraud so he could pay his country club dues. Also, the trial prosecutor improperly used Yan Skwara's guilty plea as substantive evidence of guilt. This was

23

in violation of well-established law, and the district court failed to give a limiting instruction.   Although there was no objection, the error was plain.

The combined effect of the preserved and unpreserved errors deprived Mr. Newton of a fair trial. Although there was no dispute that Mr. Newton paid the kickback, he was charged with a different crime:  Inducing the pension fund to overpay for his stock, to the detriment of the pensioners.   The evidence consistently showed, however, that Mr. Newton believed in his company and believed he was offering the fund a good investment.  As noted above, the government never showed that the stock price was artificially inflated.   Furthermore, the government set all terms of the deal.  Hence, despite the litany of misdeeds alleged in the government's closing argument, the was no real evidence that Mr. Newton committed the specific offenses for which he was on trial.   As such, the combined effect of the errors cannot be disregarded as harmless.  His convictions should be vacated, and he should be granted a new trial.

## ARGUMENTS AND CITATIONS OF AUTHORITY

### I.

**The court erred by refusing to consider the market value of the securities in assessing loss and by holding Mr. Newton accountable for a transaction with respect to which he had "no agreement."**

Mr. Newton's guidelines were enhanced by eight levels based on the court's finding that the entire purchase price of the stock sold in this case, $80,000, was loss. This factual finding was clearly erroneous. Because the finding rested on a misapplication of the guidelines, it was error as a matter of law.

The sentencing guidelines define loss, subject to exclusions not applicable here, as "the greater of actual loss or intended loss." U.S.S.G. § 2B1.1, comment. (n.3A). The estimate of loss shall be based on available information," taking into account such factors as "[t]he fair market value of the property," *Id.* at n.3(C)(i). The guidelines clearly state that loss amount shall be reduced by "the money returned, and the fair market value of the property returned and the services rendered, . .. to the victim before the offense was detected." U.S.S.G. § 2B1.1, comment. (n.3((E)(i)). While a sentencing court "need only make a reasonable estimate of loss," U.S.S.G. § 2B1.1, comment. (n.3(C)), a sentencing judge "must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines."

25

*United States v. Medina*, 485 F.3d 1291, 1304 (11th Cir. 2007) (citations omitted).

Loss amount must be proven by a preponderance of reliable and specific evidence.

*Id*. (citation omitted).

A.    The court failed to make a reasonable estimate of loss based on
      the available information.

The court is required to "'make a reasonable estimate of the loss, given the available information.'" *United States v. Snyder*, 291 F.3d 1291, 1295 (11th Cir. 2002) (citation omitted) (holding that district court erred in determining that calculating loss to victims was not feasible and substituting intended gain for loss amount).   The government's theory of the case was that Mr. Newton induced the pension fund to pay an inflated price for stock based on the kickback.   Both Mr. Newton and the government had experts available who would have presented evidence as to how to calculate loss based on this theory.   *See* DE205:20 (statement of prosecutor that the government had an expert present) DE205:26-38 (proffer and *voir dire* of testimony from Mr. Newton's expert, Dr. Pomerantz).   *See also* DE187 (attaching expert testimony from government experts in similar cases); DE215-1 (Pomerantz affidavit).   The court's refusal to consider this available evidence and discern a reasonable estimate of loss was error.

B.    <u>The district court applied an invalid theory of loss.</u>

"No actual loss resulted from this offense."  PSI ¶ 21.  Nonetheless, the court reasoned that the full sale of the stock was the loss amount because there was "no reason for this stock to have been purchased in the first place."  DE205:20.  The court found that the acquisition of the stock was essentially "worthless" because there was "nothing literally that the pension fund could have legally done in order to receive any value from it."  DE205:24.  This was error.

"[T]he analysis in a case of fraud is not as simple as in a case of simple theft." *United States v. Tatum*, 138 F.3d 1344, 1346 (11th Cir. 1998).  "In a simple theft, there is almost always an intent to deprive the victim of the value of the property taken.  Thus, it is appropriate to allow no reduction for the recovery of any portion of the stolen property.  In some cases of fraud, there will be a similar intent to deprive the victim of the full amount fraudulently taken.  However, in other cases of fraud, the perpetrator may intend no loss." *Id*.  Here, there was evidence that Mr. Newton intended that the stock in his company would lose value.  Rather, the evidence showed that Newton believed in, and was proud of, his company.  *See* G.Ex2A:6 ("It's a real company.  It's got some real credibility.").

The fact that a transaction is induced or tainted by fraud is insufficient to transform the gross value of the transaction into "loss" for sentencing purposes.  In

*Tatum*, the Court vacated a sentence where the district court used the entire gross proceeds of fraudulently-procured contracts as loss without reducing the amount by the value of services rendered. *See Tatum*, 138 F.3d at 1346. In *Medina*, the Court vacated a sentence where the district court used the entire amount Medicare paid out in claims as a "loss," where there was insufficient evidence that the claims were not medically necessary. *See Medina*, 485 F.3d at 1304 ("evidence that shows that United and Ocean paid kickbacks from a fixed level of profits is not sufficient to show actual or intended loss to Medicare"). The court below similarly erred by substituting the gross amount of the sales for loss without assessing what pecuniary loss was actually suffered by the fund.

The district court speculated that the stock could have become worthless if the fraud had become known. *See* DE205:36 ("Once anybody knew at the time of the restrictive nature of the stock is off, the stock is worthless."). This was error because no such loss ever occurred. *See Snyder*, 291 F.3d at 1296 (finding that government's accounting report overestimated loss "because, unlike the circumstances presented in [another case], the stock was not totally worthless after the conspiracy was discovered"). *See also United States v. Olis*, 492 F.3d 450, 546 (5th Cir. 2005) ("[T]here is no loss attributable to a misrepresentation unless and until the truth is subsequently revealed and the price of the stock accordingly declines.").

28

Furthermore, this sort of speculation is impermissible. *See Medina*, 485 F.3d at 1304 (noting that a court "must not speculate concerning the existence of a fact which would permit a more severe sentence under the guidelines") (citations omitted).

C.    Mr. Newton had no agreement with respect to Skwara's second transaction.

The court also erred by including the value of Skwara's second transaction in Newton's loss calculation because Skwara testified that he did not have any agreement with Newton regarding that transaction. DE220:163. *See* DE187:13 (arguing, in response to government's alternate theory that the kickback amount should be used as loss, that "there is no evidence that Newton was involved with, or knew that Mr. Skwara ever did a second deal with the bogus fund").

"In order to determine the defendant's accountability for the conduct of others . . . , the court must first determine the scope of the criminal activity the particular defendant agreed to undertake (*i.e.*, the scope of the specific conduct and objectives embraced by the defendant's agreement")." *United States v. Hunter*, 323 F.3d 1314, 1319 (11th Cir. 2003). (quotation omitted)). "[T]he fact that the defendant knows about the larger operation, and had agreed to perform a particular act, does not amount to acquiescence in the acts of the criminal enterprise as a whole." *Id.* at 1320 (citations omitted). Newton was not part of the criminal agreement as to Skwara's

second transaction.   Hence, Newton should not have been held accountable for any loss resulting therefrom.

## II.

### The court erred by imposing a position of trust enhancement where Mr. Newton had no relationship with the victims.

The Guidelines provide a 2-level enhancement "[i]f the defendant abused a position of public or private trust, trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3.  "The adjustment may not be employed if an abuse of trust or skill is included in the base offense level or specific offense characteristic." *Id*.

The district court applied an erroneous bright-line rule that, "when you have a CEO that commits a crime that is related to the actual company, that's an abuse of trust." DE205:60.  To the contrary, this Court has repeatedly overturned abuse of trust enhancements in cases where high ranking company officials (or those impersonating officials) committed misconduct involving their companies.  *See United States v. Ghertler*, 605 F.3d 1256, 1264 (11th Cir. 2010) (reversing enhancement where defendant, who impersonated high ranking company official, did not have actual relationship of trust with the victims); *United States v. Hall*, 349 F.3d 1320, 1324 (11th Cir. 2003) (reversing enhancement involving a pastor who ran an

30

investment fraud scheme through traveling ministry, where defendant did not hold a position of trust with victims); *United States v. Garrison*, 133 F.3d 831, 837, 841 (11th Cir. 1998) (reversing enhancement where the defendant was the CEO of a home healthcare provider that defrauded Medicare, where defendant "did not occupy a sufficiently proximate position of trust relative to Medicare").

For the enhancement to apply, the position of trust must relate to the victims of the offense. "A relationship of trust between the defendant and the victim is the *sine qua non* of the abuse of trust enhancement." *Ghertler*, 605 F.3d at 1264 (citation omitted). *See also Garrison*, 133 F.3d at 839 ("'Thus, the abuse of trust enhancement applies only where **the defendant has abused discretionary authority entrusted to the defendant by the victim** . . . '") (footnote and citation omitted) (emphasis supplied by Court); *Hall*, 349 F.3d at 1324 ("we must focus on the relationship between Hall and the victims from the perspective of the victims"). Furthermore, the abuse of trust must significantly facilitate the offense of conviction. *United States v. Barakat*, 130 F.3d 1448, 1455 (11th Cir. 1997).

Furthermore, "[t]he conduct that is the basis of the conviction must be independently criminal . . . and not itself the abuse of trust." *See Garrison,* 133 F.3d at 843 (citation and alteration omitted).    The offense of which Mr. Newton was convicted - paying a bribe in connection with the sale of stock in his company - is the

31

same as the basis for the enhancement.  Therefore, the two-level enhancement of abuse of position of trust was error. *See id*. ("Since Garrison's base fraud crime was the submission of false statements on cost reports submitted to Aetna for Medicare reimbursement, she cannot receive an enhancement for abuse of position of public trust based on the same conduct under the specific terms of section 3B1.3.").

Mr. Newton had no relationship with the alleged victims in this case.  His status as CEO of RLAB, without more, is insufficient to justify the enhancement.

## III.

**Mr. Newton's convictions must be vacated because the government failed to prove the offenses charged in the indictment and encouraged the jury to convict on alternate grounds.**

The second superseding indictment alleged that Mr. Newton knowingly and with intent to defraud, devised a scheme to obtain money and property by means of materially false and fraudulent pretenses, in violation of 18 U.S.C. § 1346.  The "Manner and Means" section of the indictment alleged that Mr. Newton "agreed to participate in a pay-to-play scheme to pay a thirty percent (30%) kickback to a purported pension fund fiduciary to induce the pension fund fiduciary to purchase RLAB shares at an artificially inflated price."  DE19:3 at ¶4.  The allegation that the kickback was paid to induce the fund to purchase stock at an inflated price was

32

repeated throughout the indictment. *See* DE19:3 at ¶¶5,7,9 (manner and means of "scheme and artifice" of mail fraud, counts one and two); DE19:5 at ¶4 (incorporating same into RLAB securities fraud counts three and four); DE19:8 ¶4 (manner and means of conspiracy to commit securities fraud, count five); DE19:9 ¶8,10 (same); DE19:10 ¶ 1 (over acts of conspiracy to commit securities fraud, describing "scheme to purchase USFM shares at an inflated price"); 19:11 ¶4 (incorporating manner and means of conspiracy to commit securities fraud (count five) into substantive USFM securities fraud counts six and seven)

The government never proved this essential allegation. Nor did the government prove that Mr. Newton made any misrepresentation related to the price of the stock. Therefore, his convictions must be vacated.

A.    There was no evidence Newton sought to induce an artificially inflated price.

The government never established the central allegation in this case -- that the stock was sold at an artificially inflated price. It is not simply a truism that restricted stock is inherently less valuable than free-trading stock. *See* DE187; DE215-1. Stock is a financial product that has ascertainable market value. In its opening statement, the prosecutor stated it would call an expert to provide this actual, objective value for the jury. *See* DE218:29 (stating that expert would testify "that restricted stock is

33

worth less than the regular stock that you would buy on the stock exchange and should not be sold at the same price that the Defendant sold the pension fund."). For whatever reason, however, the government chose not to call this expert, and the evidence was not provided.

In rebuttal closing, the government told the jury, "[y]ou can do this in your sleep, the difference between free-trading and restricted stock." The prosecutor argued that "Mr. Skwara was basically an expert on his own company, he was the CEO, and he told you what the difference was. He told you about the stamp and having to go to a lawyer and everything else. That's what we mean by inflated price, paying more than you have to." DE222:86-87. Yan Skwara testified that when he sold restricted stock in the past, the price was discounted because of the holding period. DE220:125-26. However, Skwara was not certified as an expert and he did not testify with respect to the RLAB stock, or specifically to the value of the stock sold in this case.

In the absence of evidence, the prosecutor compared restricted stock to a "beat up Buick that needs a new motor," and argued that "nobody wants restricted stock," DE222:38-39. *See also* DE222:38 ("And use your common sense, which would you want, a Ferrari that you get in, you turn on the keys and you go, or a Buick that needs a new motor?"). But some buyers do want restricted stock, and in this case, the

pension fund wanted it.  DE222:35 ("In this particular case . . . because of the share price and how thinly it was traded.  If we were to move forward, it would only be a restricted transaction").  It made sense that the fund would not care about the holding period, as pension funds are generally viewed as long-term investments.

It was not reasonable a reasonable inference for the jury to conclude, in the absence of evidence, that the stock was worth less than what was paid for it.  The fact that the shares would have to be transferred before they could be sold is not sufficient to prove the price was inflated or that the stock was worth less than what was paid for it.

B.    The was no material misrepresentation.

Mr. Newton's convictions must further be vacated because there was no evidence of any misrepresentation, made by either Newton or Mr. Skwara, material to the fraud.   Newton was charged with engaging in misrepresentations or deceits that induced the pension fund to pay an inflated price for the stock.  There was no evidence of this.  Rather, the deal proposed by the government was always for restricted stock, and the government set the price. DE222:35-37.  Neither Newton or Skwara misrepresented anything relevant to the price of the stock.

Nor could any alleged misrepresentation have been "material," since all terms of the deal were defined by the decision makers in this case.  "Information is material

35

if it has 'a natural tendency to influence, or [is] capable of influencing, the decision maker to whom it is addressed." *United States v. Wetherald*, 636 F.3d 1315, 1324 (11th Cir. 2011) (emphasis added). There were no misrepresentations that had any tendency to influence the decision makers in this case. Rather, the decision makers came up with the deal. Mr. Newton and Mr. Skwara merely agreed.[3]

C.  The prosecutor's comments constructively amended the indictment.

Mr. Newton's convictions must be vacated because the government urged the jury to convict without finding that he induced an inflated stock price, as charged in the indictment. The jury was urged to convict instead on the basis of the kickbacks or on any number of misdeeds mentioned throughout the closing argument. The indictment does not allow for a conviction on either basis.

---

[3]Mr. Newton moved for a judgment of acquittal at the close of the government's case. DE225:153. Although he did move documents into evidence, he did not put on any witnesses, and there was no rebuttal. DE225:167-70. Therefore, he believes the motion is sufficiently preserved for the Court's review. If, however, the Court finds that Mr. Newton needed to renew his motion for judgment of acquittal, he maintains that it would be a manifest injustice to uphold his conviction. "To uphold a conviction, in the absence of any evidence as to an essential element, would be a 'miscarriage of justice.'" *United States v. Tapia,* 761 F.2d 1488, 1492 (11th Cir. 1985).

1.     The government urged the jury to convict based on an uncharged
       honest services theory.

Mr. Newton was charged with mail fraud under 18 U.S.C. § 1341.  This was the statute addressed in *McNally v. United States*, 483 U.S. 350, 360, 107 S. Ct. 2875, 2882 (1987), and is "limited in scope to the protection of property rights."   Mr. Newton was not charged under 18 U.S.C. § 1346, which was enacted after *McNally* to define a "scheme or artifice to defraud" to include a deprivation of the intangible right to honest services.  *See Skilling  v. United States,* — U.S. —, 130 S. Ct. 2896, 2927-29 (2010) (discussing *McNally,* and Congress's enactment of 18 U.S.C. § 1346); 18 U.S.C. § 1346 ("For purposes of this chapter, the term 'scheme or artifice to defraud' includes a scheme to deprive another of the intangible right of honest services.").   Nor was the jury instructed on an intangible rights theory.    The government was required to prove that Mr. Newton intended to deprive a victim of "money and property."   DE19:2.

Nonetheless, the government began its closing argument by stating: "This case is about the Defendant's bribes and his lies, a kickback and a coverup."  DE222:22. *See also* DE222:24 ("That's the bribe, and he paid off those bribes because he wanted his own golf bills paid for, and then he covered it all up").

37

The prosecutor did argue, eventually, that the pension fund got restricted shares at the nonrestricted price, and "that's how they were defrauded.  They got the restricted stock, the beat up Buick that needs a new motor, and they had to pay the Ferrari price."  DE222:39.  However, after Mr. Newton argued that the government had failed to prove this central allegation, the prosecutor began his rebuttal by telling the jury that "the kickback and the concealment" were "what this case is about." DE222:84.  He chided defense counsel for "focus[ing] only on the inflated price language"  and argued that the indictment offered "just a general description of the fraud." DE222:84-85.

> This is Counts 1 and 2, and it alleges the manner and means of the scheme and artifice. And you notice it says, but was not limited to, so *it just gives you a flavor*, an idea of what was alleged in this case.
>
> Now, [Defense counsel] highlighted part of it, but let me read the rest of it to you: "Mr. Newton agreed to participate in a pay-to-play scheme to pay a 30 percent kickback;" he paid a 30 percent kickback. "Received a wire in the amount of $20,000 to purchase 4,000,000 shares; $6,000 check. $20,000 for the purchase of 2,000,000 shares; $6,000 check to pay an illegal, undisclosed kickback.
>
> *That's what this case is about, the kickback and the concealment*. It's in the indictment, it is there for you to read.
>
> Now, instead, *he focuses only on the inflated price  language*.  And again, remember, these are not limited to *just a description, a general description of the fraud*. . . .

DE222:84-85 (emphasis added).

38

Based on this, the jury might have believed that it did not need to find that Mr. Newton induced the fund to pay an inflated price for the stock. The jury may have concluded that the payment of the kickback itself constituted the fraud.

This is insufficient to establish mail fraud based on the based on the deprivation of money or property under 18 U.S.C. § 1341. *See United States v. Conover*, 845 F.2d 266, 271 (11th Cir. 1988) ("The jury instruction allowed the jury to convict the defendants upon a finding either that a 'detriment' to Seminole was the unfaithful service of Conover or the payment of a 'bribe' or 'kickback.' Because we cannot perceive that the jury convicted the defendants on the ground that they unlawfully deprived Seminole of money or tangible property, we are compelled to vacate their convictions") (internal citation omitted). *Cf. also United States v. Medina* 485 F.3d 1291, 1303 (11th Cir. 2007) (holding that payment of kickbacks alone was not "sufficient to establish health care fraud without someone making a knowing false or fraudulent representation to Medicare.") (citation omitted).[4]

"A constructive 'amendment occurs when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction

---

[4]It is possible the government did not charge honest services fraud in this case because it could not establish that Newton breached a fiduciary duty. *See United States v. deVegter*, 198 F.1324, 1330 (11th Cir. 1999) ("a private sector violation of § 1346 honest services fraud involves a brief of a fiduciary duty and a reasonably foreseeable economic harm").

beyond what is contained in the indictment.'" *United States v. Castro*, 89 F.3d 1443, 1453 (11th Cir. 1996) (citation omitted). "When considering an argument that an indictment was constructively amended, we are required to determine whether the prosecutor's actions or the court's instructions, 'viewed in context,' resulted in the expansion of an indictment either literally or in effect." *United States v. Behety*, 32 F.3d 503 (11th Cir. 1994).

In this case, the rebuttal closing essentially told the jury that it could substitute the kickback for proof of an inflated stock price. This constructively amended the indictment returned by the grand jury and was reversible error.

2.    The prosecutor told the jury the indictment offered "just a flavor"
      of the fraud.

The indictment was further amended by the prosecutor's arguments that the indictment offered just a "flavor" or "general description" of the fraud. These comments must be viewed in context, and considered in relation to the scattershot list of allegations, wholly unrelated (insider trading, fraud on the market) or at best tangentially related (press releases, "pump and dump") to the case at hand, that fortified the closing argument.

The prosecutor argued that, by accepting the pension fund's investment, Mr. Newton "defrauded the market."

40

[T]his is a small company.   And all of a sudden, this big pension fund came in and invested and if anyone found out that the big Wall Street people were suddenly investing in a small company, you would think to yourself, 'Well, maybe this is some great news.   Maybe this is an amazing startup.  It's the next Google, and people think, 'We should buy into this thing, we should buy into this thing.'  It was all because of the fraud, it was all because of the kickback check, and it was all secret.

All right.  So he made a material misrepresentation, he defrauded everybody.  ***He defrauded the market because of that***.  He didn't even stop there, he went forward.  We have the kickback check, the fake agreement.  He talked about timing press releases.

DE222:30 (emphasis added).

The prosecutor argued that Mr. Newton entered into "[k]ickback payments, fake agreements, press releases," and "talking about pump and dumps, doing all of the things to further the fraud, because he wants to pay his gas and golf bills." DE222:31.  *See also* DE222:36 ("He knows it's a pump and dump, he knows it is fraud..."). DE222:39 ("Well, let's call investor relations what it really is; it's a pump and dump; it's a scheme.  It is a way to manipulate the stock price, the stock volume. It is manipulating the market.  That's what Mr. Newton always wanted to do, was to do a pump and dump,[5] pay brokers to do that part of the scheme.  It was also related to the cover up.").

---

[5]Mr. Newton disputes that the evidence supported this in any event.

41

The prosecutor also invited the jury to draw conclusions based on Mr. Newton's previous relationship with Richard Epstein, the cooperating witness. The evidence showed that Mr. Epstein and Mr. Newton had conducted deals together, though they had never actually met. *See* G.Ex.2A:3. In closing, the prosecutor reminded the jury that Mr. Epstein was a "convicted felon" who "did securities fraud;" Mr. Newton had done "three, four, or five deals with Mr. Epstein; they were connected. Mr. Newton, the Defendant, was connected with Mr. Epstein, the securities fraud defendant. They did deals together." DE222:42. *See also* DE222:43 ("Mr. Newton felt comfortable with Mr. Epstein, the securities fraud defendant, and that's why he was there.").[6]

The "flavor" comment may have been in response to Mr. Newton's closing argument, which began by arguing that the case was ***not*** about insider trading, pumping and dumping, or whether Mr. Newton improperly used the funds that were given to him as an investment. DE220:50-51. The prosecutor argued that "the insider trading, pump and dump press release issue" was related to the scheme

---

[6]Prior to the trial, the government sought to admit evidence pursuant to Fed. R. Evid. 404(b), supported primarily by Epstein's statements, that Newton had previously "proposed engaging in questionable securities transactions," that "could have violated securities regulations," or "could have potentially circumvented the intent of regulations." DE74:2. Obviously, allegations that Newton had previously "proposed" engaging in "questionable" conduct would not have satisfied 404(b), and no evidence was admitted on this basis.

because it was stated that if Newton could "kick up the stock price" it would win him "brownie points with the fund." *See* DE222:87. "He is linking the pump and dump, the market manipulation, the press releases with the stealing from the pension fund because it would earn him brownie points and would lower the scrutiny." DE222:88. "He had intent to manipulate the market, to time the press releases to defraud the pension fund." DE:222:88

However, Mr. Newton was not on trial for these theories of fraud. The closing argument nonetheless invited the jury to convict any theory of fraud it saw fit. The jury did not have to focus on the specific allegations in the indictment: they were "just a flavor," or a "general description" of the fraud. DE222:84-85. The argument was reinforced by closing argument's focus on greed, golf bills, and Mr. Newton's unspecified prior relationship with Mr. Epstein. The prosecutor's closing argument constructively amended the indictment and was reversible error *per se*.

## IV.

**Mr. Newton's conviction on count seven must be set aside because the sole coconspirator testified that he had no agreement with Mr. Newton regarding that transaction.**

Mr. Newton's conviction on count seven must be vacated for the additional reason that Mr. Skwara's second transaction with the pension fund was outside the scope of Mr. Newton's criminal agreement.  Count seven alleged a substantive count of securities fraud based on Yan Skwara's second sale of USFM stock to the pension fund.  DE19:11-12.  Skwara testified, however, that he had no agreement with Newton regarding this transaction.  DE220:163.  Count seven was thus outside the scope of the unlawful plan, and Newton's conviction on that count must be vacated. *See United States v. Johnson*, 730 F.2d 683, 690 (11th Cir. 1984) ("[A] conspirator can be found guilty of a substantive offense based upon acts of a coconspirator done in furtherance of the conspiracy, unless the act 'did not fall within the scope of the unlawful project, or was merely a part of the ramifications of the plan which could not be reasonably foreseen as a necessary or natural consequences of the plan."). *See also Pinkerton v. United States*, 382 U.S. 640, 648, 66 S. Ct. 1180, 1884 (1946) ("A different case would arise if the substantive offense committed by one of the conspirators . . . did not fall within the scope of the unlawful project . . . ").

44

## V.

## The cumulative effect of trial errors deprived Mr. Newton of a fair trial.

"[T]he cumulative prejudicial effect of many errors may be greater than the sum of the prejudice caused by each individual error," *United States v. Baker*, 432 F.3d 1189, 1223 (11th Cir. 2005), and may require reversal even if the evidence is sufficient to establish the defendant's guilt. *United States v. Hands*, 184 F.3d 1322, 1329 (11th Cir. 1999). *See also United States v. Marshall*, 173 F.3d 1312, 1314-1315 (11th Cir. 1999) (finding cumulative effect of evidentiary errors required reversal).

In addition to the errors discussed above, a new trial is required based on the following.

A.    The court abused its discretion by allowing hearsay.

The district court abused its discretion by allowing Agent Sputo to testify "the Club at Morningside" was "a private golf and tennis country club in Rancho Mirage, California," that Mr. Newton's son lived in the apartment managed by Braun Real Estate, and that Springs Homeowners Association was the association related to Mr. Newton's home address. These out-of-court statements were admitted for their truth and do not fall within any recognized hearsay exception. The government suggested that the testimony regarding the homeowners' association might fall under a business

45

exception. *See* DE225:101-102. The Court said, "[i]t may, I don't think it is the only one for this." DE225:102. The court noted that there is a "residual exception for hearsay that says that there are certain things or certain statements that come with such an indicia of reliability, that even though it doesn't fall within one of the delineated exceptions, the Court may allow it." DE225:101.

With respect to the country club and the homeowner's association fees, Agent Sputo testified to information he learned over the Internet ("on line") and from unidentified persons on the telephone. DE225:119-122. Neither of these even comes close to qualifying as a "business record" under the rules. *See* Fed. R. Evid. 806 (exempting from hearsay prohibition record of an act or event if it was made by someone with knowledge, kept in the regularly conducted course of activity, and the business was in the regular practice of that activity). Nor did the government satisfy the foundational predicates of Fed. R. Evid. 803(6)(D) (requiring foundational conditions to be established by testimony of custodian or other qualified witness or certification).

With respect to Mr. Newton's son's residence, Agent Sputo testified that he "went to a law enforcement database that . . . accumulates utility bills and other records into one database." DE225:116. This contains two layers of hearsay: the underlying records and the law enforcement database. Although it is possible either

46

or both met the general criteria of Rule 806, the foundational predicates were not satisfied.

The district court further clearly erred by ruling that this sort of testimony could fall under the residual exception to the hearsay rule. Fed. R. Evid. 807(a). "Congress intended the residual hearsay exception to be used only very rarely, and only in exceptional circumstances," . . . and it 'appl[ies] only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present." *United Techs. Corp. v. Mazur*, 556 F.3d 1260, 1279 (11th Cir. 2009) (citations omitted). The rank hearsay offered by Agent Sputo -- relaying what "somebody at the club" or "somebody on the phone" told him -- fell far short of meeting this standard. There were no exceptional guarantees of trustworthiness here. Nor was this evidence -- obtained at the end of the trial and used primarily to disparage Mr. Newton in closing argument -- necessary.

Furthermore, Rule 807 includes one very clear condition precedent indisputably unmet: "The statement is admissible only if, before the trial or hearing, the proponent gives an adverse party reasonable notice of the intent to offer the statement and its particulars, including the declarant's name and address, so that the party has a fair opportunity to meet it." Fed. R. Evid. 807(b). No such notice was given in this case. The admission of the testimony was a clear abuse of discretion.

The government used this testimony from the beginning to the end of its closing argument to paint Mr. Newton as a greedy man who defrauded the pensioners to maintain his luxury lifestyle.  In the first paragraph of closing argument, the prosecutor argued:  "He took that money for his personal use, he paid his golf and his gas bills; that was his scheme."  DE222:22.  The last thing the prosecutor said to the jury in rebuttal was:  "Mr. Newton put his personal interest, his desire for the country club, his desires ahead of everyone else's and you can't do that.  For those reasons, he is guilty of all the counts of the indictment."  DE222:96.

In between, the prosecutor mentioned the evidence nine more times, focusing on the "golf bills," and the "country club."  DE222:23 ("Mr. Newton used the pension fund money as a personal piggy bank; golf, his son's apartment, the gas bills"); DE222:24 ("and he paid off those bribes because he wanted his own golf bills paid for, and then covered it all up"); DE222:31 ("Doing all of these things to further the fraud because he wants to pay his gas and his golf bills"); DE 222:93 ("He said it is really quite terrible of Mr. Epstein to say, 'Look, here is your chance for money.  You can either try and steal it or maybe you won't be able to go pay your golf bills – golf course bills.  You know, you may not have to have cable tonight.') (emphasis added); DE222:93 ("That's really terrible, it is just terrible that Mr. Epstein would do that to the Defendant; 'If you want to, you can steal this money and pay for your golf.'  What

a terrible dilemma Mr. Newton faced.  To give up golf, cable, can you imagine a life without cable?  It is crazy.").

The prosecutor argued this evidence was directly relevant to Mr. Newton's intent to defraud – the sole issue in the case.  DE222:94 ("Now, [Defense counsel] talked about, you know, the use of the money is not part of the scheme, but the indictment doesn't allege that Mr. Newton intended to use the money for the golf and his gas bills. . . . Mr. Newton's intent is essential here.  He knows his company is suffering, he wants to continue the lifestyle he was living, with his homeowner fees and the gas bills and the cable, and that's why he did it.").  The extensive use of this testimony confirms that it was central to the government's argument on intent.

B.    The trial prosecutor used Mr. Skwara's guilty plea as substantive evidence of Mr. Newton's guilt.

The prosecutor also argued that Mr. Newton was guilty because Mr. Skwara had pled guilty to doing the same.  The prosecutor compared Newton's and Skwara's conduct, and reminded the jury that Skwara admitted that he had committed fraud.  *See* DE222:35 ("Mr. Skwara admitted that he committed fraud, and you saw how hard it was for him to do that. . . Mr. Skwara admitted he did something wrong. [Paragraph break]  Let's turn to the evidence about what Mr. Newton's did.").  *See also* DE222:94 ("Mr. Skwara made the decision,  Mr. Newton made the decision.").

49

The prosecutor argued that the jury "kn[e]w Mr. Newton had the intent because Mr. Skwara had the same intent." DE222:88.    The prosecutor expressly used the guilty plea to make this point:  Skwara "admitted to you that he conspired with Douglas Newton, he pled guilty to that.  He did securities fraud, and so did Mr. Newton." DE222:88. DE222:94 ("You cannot do that, that is not a defense, and Mr. Skwara knew that.  He knew that, and he admitted it.  I asked him, 'Are you allowed to do this, is this a defense,' and he said no.").  This is impermissible.

"It is a well-accepted principle that 'evidence about the conviction of a co-conspirator is not admissible as substantive proof of the guilt of a defendant.'" *United States v. Mitchell*, 1 F.3d 235, 240 (4th Cir. 1993) (citation omitted) (finding plain error where the trial prosecutor  "urged the jury to convict the appellant because the appellant's brother had been convicted of participating in the same conspiracy"). "Due to the extreme and unfair prejudice suffered by defendants in similar situations, courts and prosecutors are generally forbidden from mentioning that a codefendant has either pled guilty or been convicted." *United States v. Griffin*, 778 F.2d 707, 710 (11th Cir. 1985) (reversing conviction where the court took judicial notice that co-conspirator had been adjudicated guilty and reading indictment to the jury) (citations omitted). *See also United States v. De La Vega*, 913 F.2d 861 (11th Cir. 1990) ("[i]n most occasions, the admission of a co-defendant's guilty plea will substantially affect

50

the defendant's right to a fair trial in that 'the jury may regard the issue of the remaining defendant's guilt as settled and that the trial is a mere formality.'") (citations omitted).

An exception exists "where a codefendant takes the witness stand," and the evidence is introduced "to aid the jury in assessing the co-defendant's credibility." *Griffin*, 778 F.2d at 710 n. 5 (citation omitted). Here, however, Skwara's plea was not used merely to discuss Skwara's credibility. Rather, the prosecutor invited the jury to conclude that Mr. Newton was guilty based on Skwara's testimony that he had committed, and pled guilty to, the same crime. "[T]he clear thrust of the prosecution's argument" was that Skwara's guilty plea "should be used as substantive evidence of the appellant's guilt." *Mitchell*, 1 F.3d at 240. Although Mr. Newton did not object, the argument was plainly impermissible.

C.    The court plainly erred in failing to give a limiting instruction.

The error was compounded by the district court's failure to give a limiting instruction. When "a witness-accomplice's guilty plea" is brought out at trial, the jury must be given a "'clear and strong cautionary instruction' . . . that it may use the accomplice's guilty plea only to assess his credibility as a witness and not to create an inference of guilt against the accused." *See  United States v. Borchardt*, 698 F.2d 697, 701 (5th Cir. 1983) (emphasis added) (citations omitted).

51

*United States v. King*, 505 F.2d 602, 607 (5th Cir. 1974) "surveyed the law and laid out the test that has been followed in this circuit," regarding whether the admission of a coconspirator's guilty plea will be considered reversible error. *See United States v. Hernandez*, 921 F.2d 1569, 1582 (11th Cir. 1991).   That test is:

> Whether there was a proper purpose in introducing the fact of a guilty plea, whether the plea was improperly emphasized or used as substantive evidence of guilt, whether the introduction of the plea was invited by defense counsel, whether an objection was entered or an instruction requested, whether the defendant's failure to object to the testimony could have been the result of tactical considerations, and whether, in light of all the evidence, the failure to give an instruction was harmless beyond a reasonable doubt.

*King*, 921 F.2d at 608.

Although the Court has rarely reversed convictions for plain error plain error based solely on the improper introduction of a coconspirator's guilty plea, s*ee Hernandez*, 921 F.2d at 1582, this case differs because the plea was used for an improper purpose. *See United States v. Vigliatura*, 878 F.2d 1346, 1348 (11th Cir. 1989) ("it does not appear from the record that the government improperly emphasized or attempted to use Nolf's testimony as substantive testimony of Vigliatura's guilt"); *United States v. Chilcote*, 724 F.2d 1498, 1504-05 (11th Cir. 1984) ("Appellant has not pointed us to any place in the record, and we have not found a place in which the government improperly attempted to use Lewington's plea

to conspiracy charges as substantive evidence that appellant was guilty of conspiracy"). *Cf. also United States v. Smith*, 893 F.2d 1269, 1273 (11th Cir. 1990) (finding no error where there was an objection, limiting instructions were given, the defendants did not claim "that the pleas were improperly emphasized or used in any way by the United States as 'substantive evidence of guilt.'"); *United States v. Edwards*, 716 F.2d 822, 25-26 (11th Cir. 1983) ("The trial judge twice issued cautionary instructions limiting the jury's permissible use of the evidence of the guilty plea. The guilty plea was not emphasized by the Government during redirect, nor in closing argument"). Because the prosecutor misused the evidence, the district court's failure to *sua sponte* issue a limiting instruction was plain error.

D.     The combined effect of these errors warrants a new trial.

There was no doubt that Mr. Newton paid a kickback in this case. But, as discussed above, this was not the relevant charge in the case. The government was required to show that Newton used a misrepresentation or deceit in order to induce the fund to overpay for his stock. There was no evidence of this.

Rather, Mr. Newton's statements and conduct confirmed his belief that his company was a good investment for the fund. *See generally* Gov.Ex.2A; DE222:58-74 (defense closing argument). Although the government opposed Mr. Newton's request for a "good faith" jury instruction, the government conceded that his lack of

53

intent to harm the fund was a valid defense to this charges in the indictment.  *See* DE225:207-08 ( "he can and should argue that.").  All of the trial errors outlined above relate to the critical issue of Newton's intent, and were thus relevant to the questions before the jury.

A conviction should be based on evidence that fulfills the elements of the offense charged in the indictment.  Lacking such evidence in this case, the government invited the jury to convict because Mr. Newton committed uncharged misconduct, did the same thing as Yan Skwara who had pled guilty, was "connected" to Richard Epstein, and used the money he obtained from the fund to pay his "golf bills."  The errors deprived Mr. Newton of a fair trial and his convictions should be vacated.

## CONCLUSION

Based upon the foregoing argument and citations of authority, Mr. Newton asks the Court to vacate his conviction and sentence and remand for further proceedings.

MICHAEL CARUSO
FEDERAL PUBLIC DEFENDER

 *s/Tracy Dreispul*
Tracy Dreispul
Assistant Federal Public Defender
150 West Flagler Street, Suite 1500
Miami, Florida 33130-1555
Telephone No. (305) 536-6900

## CERTIFICATE OF COMPLIANCE

I CERTIFY that this brief complies with the type-volume limitation and typeface requirements of FED. R. APP. P. 32(a)(7)(B), because it contains 12,196 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief also complies with the requirements of Fed. R. App. P. 32(a)(5) and (a)(6) because it has been prepared in a proportionally spaced typeface using WordPerfect in 14 point, Times New Roman.

_s/Tracy Dreispul_____
Tracy Dreispul

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY certify that on this 11th day of March, 2013, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF and sent seven copies to the Clerk of the Court via third party commercial carrier for delivery within three days.  I also certify that the foregoing document is being served this day via CM/ECF on Anne R. Schultz, Assistant United States Attorney, 99 N.E. 4th Street, Miami, Florida 33132.

*s/Tracy Dreispul*
Tracy Dreispul