[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-16001

_____

D. C. Docket No. 0:11-cr-60150-MGC-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DOUGLAS NEWTON,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(March 19, 2014)

Before ANDERSON, Circuit Judge, and MOODY* and SCHLESINGER,** District
Judges.

_____

\* Honorable James S. Moody, Jr., United States District Judge for the Middle District of
Florida, sitting by designation.

** Honorable Harvey E. Schlesinger, United States District Judge for the Middle District
of Florida, sitting by designation.

SCHLESINGER, District Judge:

Defendant was the President, Secretary, and sole Director of Real American Brands, Inc. ("RLAB"). The Second Superseding Indictment alleged that Defendant agreed to pay kickbacks to induce a pension fund to buy restricted shares of RLAB's penny stock. When informed that the pension fund would no longer purchase any more of RLAB stock, Defendant conspired with a friend, Yan Skwara, to pay the same kickbacks for the purchase of stock in Skwara's company. Unbeknownst to Defendant, the pension fund was fictitious and he was speaking with undercover FBI agents.

Defendant was charged by a seven-count Second Superseding Indictment. Counts 1 and 2 alleged that Defendant knowingly and with intent to defraud, devised a scheme and artifice to defraud and to obtain money and property by means of materially false and fraudulent pretenses, and that, in furtherance of that scheme, "did knowingly cause to be delivered certain mail matter by a private carrier," in violation of 18 U.S.C. § 1341 and 2. Counts 3 and 4 alleged that Defendant knowingly, willfully, and unlawfully, employed a device, scheme, and artifice to defraud in connection with the purchase and sale of securities, in violation of 15 U.S.C. § 78j(b), 15 U.S.C. § 78ff(a), 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2. Count 5 alleged conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371. Counts 6 and 7 alleged securities fraud, in violation of 15 U.S.C.

2

§ 78j(b), 15 U.S.C. § 78ff(a), 17 C.F.R. § 240.10b-5, and 18 U.S.C. § 2.  Defendant was convicted on all counts and was sentenced to 30 months' imprisonment followed by one year of supervised release.

## I. Background

On March 24, 2009, Defendant met, for the first time, with FBI Agent Robert Strickland, who was posing as "Robert Scott," the President of Northern Springs Capital Group ("NSCG").    Richard Epstein introduced Defendant to Strickland.  Defendant and Epstein had done deals in the past, and the three men met in Epstein's home in South Florida.

Defendant introduced himself as the founder of Billy Martin's USA, a "western lifestyle retail company," which later changed its name to RLAB.  RLAB owned the Billy Martin's USA brand and operated a Billy Martin's retail boutique at Trump Plaza in New York City.  RLAB was a publicly-traded company with common stock traded on the "pink sheet" market under the ticker symbol "RLAB." Defendant told Strickland that he was able to offer five hundred million shares of stock in his company, that 135 million shares of "mostly all restricted stock" had been issued, and that as the "sole director and CEO," Strickland would not have to "deal with anybody other than me."

Epstein told Defendant that he and Strickland had "found a way" to "get money."  Epstein explained to Defendant that he and Strickland had been doing

some "very interesting deals lately," which had been a "win, win, win situation for all those involved."  Strickland cautioned that this would be a "sensitive deal" and asked Defendant "to kind of keep it amongst ourselves."  Strickland explained that "this thing that I have is kind of the goose that . . . laid a golden egg for me," and that he and the "limited number of other people who" were involved "can't really afford to let it get out."  Defendant promised to keep their discussions confidential. Strickland told Defendant that he had a close personal friend named Chris Russo who was a senior executive of a national retail chain and served as the trustee of the employee pension fund.  As the trustee, Russo could control the pension fund manager, whom Russo had hired and placed in that position.  Russo and the fund manager had discretion "over every cent of the fund" and were able to provide "opportunities" to buy stocks in companies like Defendant's.  Generally, Russo would cause the pension fund to buy $20,000 to $30,000 worth of stock at a time. Because RLAB stock was so thinly traded, Strickland explained that the pension fund would buy restricted shares so that it would not raise "red flags," meaning unwanted scrutiny from securities regulators.  Strickland told Defendant that "what these guys do is, they do things in a very measured fashion, so as to not draw any suspicion at all."  Strickland stated that the pension fund would purchase $20,000 worth of stock "about once every three weeks."  Once the stock was purchased, it would "be buried," meaning it would not be sold.  Strickland said this to assure

Defendant that the stock would not be sold all at once and depress the price.

In exchange for the pension fund's purchase of $20,000 of RLAB restricted stock, Defendant would be required to pay a 30% kickback of $6,000, to be divided among Strickland, Russo, and the fund manager. The $6,000 kickback would be disguised as Defendant's payment for "consulting" services, and they would sign a phony consulting agreement in case they were ever questioned by the FBI or the SEC. Defendant agreed, noting that "on the very off chance" that he was ever questioned about the $6,000 payment, he could claim it was for consulting services. Strickland emphasized that despite the consulting agreement, Defendant and his company would not receive any actual consulting services.

Strickland and Defendant agreed that the pension fund would purchase $20,000 of restricted stock at the market "ask" price for free-trading shares of .005 per share, which was higher than the "bid" price of .003 per share. Strickland explained that the purchase price of the RLAB stock, and whether the stock price ultimately rose or fell, was frankly irrelevant to him and Russo. They only cared about the $6,000 kickback payment. When Defendant said that he thought Russo would be happy about the prospect of investing in an American company, Strickland responded: "Chris is gonna be happy about getting paid." Defendant responded, "Now I didn't hear that." Strickland laughed, and Defendant added, "If he gets, you know, I mean that's fine. He'll get, he'll get happy."

5

Strickland could only "guarantee" an "initial deal" of $20,000, but that there was the possibility that the pension fund would continue to buy stock in the future. Defendant was interested in more deals and stated he wanted to "have more fun, make more money."

Strickland and Defendant called Chris Russo on speaker phone. Russo, an undercover FBI agent, confirmed that he would get the pension fund to pay $20,000 for 4,000,000 restricted shares of RLAB stock in exchange for Defendant's payment of a 30% kickback. Russo emphasized the confidentiality of the deal, warning that "as far as we're all concerned here, um, we, we never had this discussion, and our relationship shouldn't really be discussed." After the phone call ended, Defendant asked Strickland, "what was the reason why he said we didn't have this discussion?" Strickland replied, "well, it's the uh, the thirty points." Defendant replied, "I hear ya. I hear ya. Well, that and that never even came up. I didn't know about that," and "I'm not making any connection between the two." Referring to the phony consulting agreement, Defendant added, "the consulting firm has already benefitted me immensely."

Later that same day, Russo, on behalf of the purported pension fund, "Benefits and Pension Group," and Defendant, on behalf of RLAB, signed a subscription agreement for the purchase of 4,000,000 shares of restricted RLAB stock. Strickland, as "Robert Scott," and Defendant signed a "consulting

6

agreement" between RLAB and a shell company called "Great Lakes Advisors, LLC" ("Great Lakes").  Defendant promised to maintain the fiction that there was no connection between his deal with Russo and the phony consulting agreement. Defendant suggested that if he and Strickland were ever talking on the phone about the deal when somebody walked into his office, Defendant would start talking about baseball as a code to indicate that he could not talk openly about their scheme.  Defendant added that he wanted the scheme "to be bigger than just uh you know, um, a monthly deal."

### A.  First RLAB Stock Purchase

On March 25, 2009, the next day, Defendant mailed Strickland a $6,000 check, from the Billy Martin's USA account, made payable to Great Lakes.  The same day, the pension fund wire transferred $20,000 to Defendant for the purchase of 4,000,000 shares of restricted RLAB stock.  On March 30, 2009, Defendant mailed a certificate for 4,000,000 restricted shares of RLAB stock, issued to Benefits and Pension Group.

Epstein wanted $5000 worth of stock for every $20,000 worth of stock the pension fund purchased to compensate him for introducing Defendant to Strickland.  On March 30, 2009, Defendant issued 1,000,000 restricted shares of RLAB stock to Epstein.

Although they had signed a consulting agreement, neither Strickland nor

7

Great Lakes ever provided consulting services to Defendant, RLAB or Billy Martin's USA.    Nevertheless, Defendant sent Strickland numerous e-mails referring to the consulting services Strickland had provided about the company's new clothing lines and retail locations.    Strickland chuckled when he received the e-mails, knowing they were Defendant's attempt to conceal the kickback as payment for his consulting services.

### B. The Second RLAB Stock Purchase

On April 7, 2009, Russo, on behalf of Benefits and Pension Group, signed a second subscription agreement for the purchase of 2,222,222 restricted shares of RLAB stock, at that day's price of .009 per share, for a total of $20,000.  This agreement was in exchange for Defendant's payment of a 30% kickback to Strickland, Russo, and the pension fund manager.

On April 8, 2009, Defendant mailed Strickland a $6,000 check, from the Billy Martin's USA account, made payable to Great Lakes.  The same day, the pension fund wire transferred $20,000 to Defendant for the purchase of 2,222,222 shares of restricted RLAB stock.  Defendant mailed, by Federal Express, a certificate for 2,222,222 restricted shares of RLAB stock to Benefits and Pension Group.

After the second purchase and kickback, Defendant continued to send Strickland e-mails referring to Strickland's suggestions about his new apparel line,

retail locations, and a trade show in Las Vegas.  Strickland never gave Defendant any such advice or suggestions about his company.

On April 13, 2009, Defendant sent Epstein a certificate for 2,000,000 restricted shares of RLAB stock.  Defendant enclosed a note stating that he wanted Epstein to "have additional stock incentive and ownership in RLAB based on the contributions you have been making and are making to the continued growth and implementation of RLAB's new business plan."

Defendant met with Strickland and Epstein in South Florida for a second time on April 28, 2009.  Defendant said that he had traveled to Florida to "check with my consultant Great Lakes," and that if anyone ever questioned "what am I doing with Great Lakes, why am I writing checks," he wanted to have "a fine record of what we've done to justify et cetera, et cetera."  Defendant announced that he had brought a "fancy looking agenda" to the meeting, and suggested they could "dispense with" the consulting in "about thirty seconds."  Defendant commented, "I wanna make sure that everything looks cool with my, uh, with my consultant Great Lakes Advisors, yada, yada, yada, okay."

Strickland remarked that he liked Defendant's effort to create a phony agenda to conceal the scheme.  Epstein noted, "this is a great cover your a-- piece of paper." While Defendant spoke about his ideas for the development of a new line of denim apparel and new boutique locations, Strickland never offered any

comment, advice, or consulting services.

Defendant wanted the pension fund to buy more stock in his company and brought a blank subscription agreement and "consulting" agreement between "Stock Services LLC" and RLAB.  Defendant, Strickland, and Epstein also discussed ways to increase RLAB's trading volume and stock price.  Defendant stated, "I am not interested in getting dumped, okay, I would like to find the right people to do a, a, a, I don't wanna say a pump and dump," and Epstein replied, "let's call it a push," and Defendant characterized it as a promotional benefit for his shareholders."[1]  Epstein observed that increasing the stock's trading volume "would probably win you some brownie points with the fund," and Strickland agreed that it would "lower the scrutiny" of SEC regulators.  Defendant told them that he had been making an effort to increase the trading volume of the stock.  Defendant, Strickland, and Epstein also discussed other ways to manipulate the market, such as the payment of brokers to push the stock, and the disclosure of company press releases to Russo before they were made public.  Epstein warned that they should not talk about these things over the phone or in e-mails.

Meanwhile, Defendant continued to send e-mails to Strickland referring to

---

[1]   A "pump and dump" is a money-making scheme where one drives the price of a stock up to a certain level and immediately sells it once it hits a certain price.  A stock is "pumped" or "pushed" when the price is pushed up, and a stock is "dumped" when a large number of shares are offered for sale.

consulting work that Strickland never provided.  For example, in a May 27, 2009 e-mail, Defendant thanked Strickland for his "good input on this new product." Strickland never provided any such advice.

### C.  Defendant's Use of the Proceeds

Between March 25, 2009, and June 22, 2009, Defendant's participation in the fraudulent scheme netted him $14,000 from each of the two RLAB stock sales ($20,000 purchase price minus his $6,000 kickback), plus $6,000 from Yan Skwara, for a total of $34,000.  During that same time period, Defendant wrote checks on the Billy Martin's USA account for his own personal expenses, including his homeowners' association, his country club, his residential gas and electric bills, and the rent on his son's apartment.

On the other hand, between April and August 2009, Defendant paid only $13,000 of the approximately $196,620 that Billy Martin's USA owed in back rent for its retail space in Trump Plaza.

### D.  Yan Swara

On April 29, 2009, Strickland called Defendant to tell him that Russo had decided against the pension fund's purchase of any more RLAB stock.  Strickland explained that Russo was very upset that the trading volume was so high, which he feared would attract unwanted attention.  Defendant asked whether Strickland and Russo would be interested in doing the same scheme with other public companies,

and suggested his friend, Yan Skwara.

Skwara, who lived in San Diego, was the CEO, President, Secretary, and Treasurer of U.S. Farms, Inc.  ("USFM").  USFM was a farming and nursery company that grew aloe vera plants and marketed aloe-based products.  Skwara also had a small consulting business.  Skwara had met Defendant in late 2008.

 Defendant told Skwara that he had a relationship with people in Florida who had caused a large pension fund to invest in RLAB, and he offered to arrange for the pension fund to invest in USFM.  USFM's stock was publicly traded on the over-the-counter "pink sheet" market under the ticker symbol "USFM."  It was thinly traded and considered to be a "penny stock" because its price was between one and three cents a share.  Its investors were mostly private individuals, and it had never had any large institutional investors.  Skwara was interested in having a large institutional investor, like a pension fund, invest in his company.

Defendant told Skwara that if the pension fund agreed to invest in USFM, Skwara would be required to pay a kickback to the people controlling the pension fund, which would be concealed by a phony consulting agreement.  In addition, Defendant wanted $6,000 for making the introduction.  Defendant described this to him as an "opportunity for both our companies to make some money" and was "anxious to see this come through."  Skwara understood that the pension fund would invest in his company "primarily due to the kickback, not so much on the

12

fact that the company had merits."

Defendant and Strickland arranged for Skwara to travel to Florida for a meeting.  Defendant gave Strickland some personal information about Skwara and promised to provide directions to Epstein's house.

Skwara flew to South Florida and met with Strickland and Epstein at Epstein's home on May 28, 2009.  Strickland, again posing as Robert Scott, told Skwara that he had a relationship with the trustee of a large pension fund, and that in exchange for a 30% kickback paid to Strickland, Russo, and the pension fund manager, the pension fund would buy USFM stock.  Strickland and Skwara agreed that the kickback would be concealed as payments to a consulting company, Great Lakes, although there would not be any actual consulting work performed.

### E.  The First USFM Stock Purchase

Skwara signed a consulting agreement with Great Lakes, and on June 5, 2009, he mailed Strickland a $6,000 check for the kickback.  Great Lakes never provided any consulting services to USFM.  The same day, the pension fund wire transferred $20,000 to USFM for the purchase of 1,000,000 restricted shares of USFM stock.  On June 15, 2009, 1,000,000 restricted shares of USFM stock were issued to Benefits and Pension Group.

To compensate Defendant for Skwara's introduction to Strickland, between June 8, 2009 and June 22, 2009, Skwara sent Defendant four cashier's checks,

totaling $6,000, made payable to Billy Martin's USA.

**F.  The Second USFM Stock Purchase**

On July 10, 2009, 2,000,000 restricted shares of USFM stock were issued to Benefits and Pension Group.  On July 14, 2009, the pension fund wire transferred $20,000 to USFM for the purchase of that stock.  On the same day, Skwara mailed Strickland a $6,000 check, made payable to Great Lakes, as the agreed-upon kickback payment.  Skwara also caused 200,000 restricted shares of USFM stock to be issued to Epstein as part of the kickback scheme.

Skwara subsequently pleaded guilty to conspiracy to commit securities fraud.  He testified for the government at Defendant's trial.

**II.  Issues Presented**

Defendant raises five issues on appeal.[2]  First, Defendant maintains his convictions must be vacated because the government failed to prove the offenses charged in the indictment.  Second, according to Defendant, his Count 7 conviction must be vacated because the sole co-conspirator testified that he had no agreement with Defendant regarding that transaction.   Third, cumulative error deprived Defendant of a fair trial.  Fourth, Defendant argues that the District Court erred by improperly calculating the intended loss amount under U.S.S.G. § 2B1.1(b)(1)(E).

---

[2]   Defendant's issues have been reordered for convenience.

14

Fifth, and finally, Defendant maintains the District Court erred by imposing a position-of-trust enhancement under U.S.S.G. § 3B1.3.

## III.  Standards of Review

"'We review challenges to the sufficiency of the evidence *de novo*,'" and ask "'whether a reasonable jury could have found the defendant guilty beyond a reasonable doubt.'" *United States v. House*, 684 F.3d 1173, 1196 (11th Cir. 2012) (quoting *United States v. Mercer*, 541 F.3d 1070, 1074 (11th Cir. 2008)).

A challenge to the sufficiency of the evidence to sustain a defendant's conviction is reviewed *de novo*.  *United States v. To*, 144 F.3d 737, 743 (11th Cir. 1998).  "But where a defendant 'present[s] his case after denial of a motion for judgment of acquittal' and then 'fails to renew his motion for judgment of acquittal at the end of all of the evidence,' we review the defendant's challenge to the sufficiency of the evidence for a manifest miscarriage of justice."  *House*, 684 F.3d at 1196 (quoting *United States v. Jones*, 32 F.3d 1512, 1516 (11th Cir.1994)). "This standard requires us to affirm the defendant's conviction unless 'the evidence on a key element of the offense is so tenuous that [the] conviction [is] shocking.'"  *Id.* (quoting *United States v. Milkintas*, 470 F.3d 1339, 1343 (11th Cir.2006)).  "'In making this determination, we must view the evidence in the light most favorable to the government and accept all reasonable inferences and credibility determinations that support the jury's verdict.'"  *Id.* (quoting *Milkintas*).

15

To demonstrate plain error, the defendant "must show that there is (1) error (2) that is plain and (3) that affect[s] substantial rights." *United States v. Lejarde-Rada*, 319 F.3d 1288, 1290 (11th Cir. 2003) (internal quotations and citations omitted). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error 'seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.'" *Id.*

Claims of prosecutorial misconduct are ordinarily reviewed *de novo*. *United States v. Eckhardt*, 466 F.3d 938, 947 (11th Cir. 2006). But when a defendant has failed to assert a contemporaneous objection to the alleged misconduct, plain error review applies. *United States v. Newton*, 44 F.3d 913, 920 (11 Cir. 1995); *United States v. Hernandez*, 921 F.2d 1569, 1573 (11th Cir. 1991).

We review the district court's amount-of-loss calculation for clear error. *United States v. Nosrati-Shamloo*, 255 F.3d 1290, 1291 (11th Cir. 2001). Clear error will be present when we are "left with a definite and firm conviction that a mistake has been committed." *United States v. Crawford*, 407 F.3d 1174, 1177 (11th Cir. 2005) (citation omitted). We review de novo the question of whether the district court properly determined a defendant's relevant conduct under U.S.S.G. § 1B1.3. *United States v. McCrimmon*, 362 F.3d 725, 728 (11th Cir. 2004).

We review for clear error a district court's "factual determination that a defendant abused a position of . . . trust." *United States v. Garrision*, 133 F.3d

16

831, 837 (11th Cir. 1998). But the district court's "conclusion that the defendant's conduct justifies the abuse-of-trust enhancement is a question of law" reviewed *de novo. Id.*

## IV. Discussion

### A. Trial Issues

The government, according to Defendant, never established the central allegation in this case—that the stock was sold at an artificially inflated price. The difficulty for Defendant, however, is that defense counsel did not renew his motion for judgment of acquittal at the close of the defense case. Due to this, we may reverse "only to prevent a manifest miscarriage of justice." *House*, 684 F.3d at 1196. "This standard requires us to affirm the defendant's conviction unless the evidence on a key element of the offense is so tenuous that [the] conviction [is] shocking." *Id.* (internal quotations omitted). As discussed below, evidence supports Defendant's convictions beyond a reasonable doubt, and Defendant fails to demonstrate that his convictions are shocking or a manifest miscarriage of justice.

Moreover, the record refutes Defendant's assertions. The evidence at trial established that the 30% kickbacks made the price of the stock irrelevant. The parties involved cared only about the kickback payments, not the stock price. In addition, because of the kickbacks, the pension fund purchased restricted shares at

17

the higher price set for freely-traded shares. Thus, the kickback itself artificially increased the stock price. The pension fund paid $20,000 for stock that should have cost only $14,000—absent the $6,000 bribe. Ample evidence existed for the jury to conclude that the fraudulent scheme caused the pension fund to pay inflated prices for the restricted shares of stock.

Likewise, Defendant's contention that there was no evidence that he made any misrepresentation material to the fraud lacks merit. A "scheme to defraud" has been broadly defined, and it may include more than fraudulent misrepresentations. *United States v. Svete*, 556 F.3d 1157, 1161-62 (11th Cir. 2009) (en banc). "'A scheme to defraud need not be carried out to constitute a violation of the mail and wire fraud statutes. These statutes punish unexecuted, as well as executed, schemes.'" *United States v. Ross*, 131 F.3d 970, 986 (11th Cir. 1997) (citing *Pelletier v. Zweifel*, 921 F.2d 1465, 1498 (11th Cir. 1991). "The Government merely needs to show that the accused intended to defraud his victim and that his or her communications were reasonably calculated to deceive persons of ordinary prudence and comprehension." *Id.* (internal quotation and citation omitted).

The evidence here demonstrated that Defendant engaged in a scheme to defraud the pension fund beneficiaries by making undisclosed kickbacks to induce the purchase of stock at inflated prices. While the undercover FBI agents initiated the deal and proposed the terms, Defendant voluntarily joined the scheme, and then

18

urged Skwara to participate for Defendant's own gain.  Furthermore, Defendant attempted to conceal the kickback agreement with a fictitious consulting agreement, and numerous e-mails referring to advice he never received.  Finally, Defendant's words and conduct, as captured on the recorded tapes played at the trial, demonstrated his intent to defraud the pension fund investors.  Accordingly, there was no miscarriage of justice.

Defendant also maintains the prosecutor's comments to the jury constructively modified the indictment.  "It is well settled that a defendant enjoys a Fifth Amendment right to be tried on felony charges returned by a grand jury indictment and that only the grand jury may broaden the charges in the indictment once it has been returned."  *United States v. Sanders*, 668 F.3d 1298, 1309 (11th Cir. 2012) (citing *Stirone v. United States*, 361 U.S. 212, 215–16 (1960)).  A constructive amendment to an indictment occurs "when the essential elements of the offense contained in the indictment are altered to broaden the possible bases for conviction beyond what is contained in the indictment."  *United States v. Keller*, 916 F.2d 628, 634 (11th Cir. 1990).  A constructive amendment is present when "the jury instructions modify the elements of the charged offense so much that the defendant may have been convicted on a ground not alleged by the grand jury's indictment."  *Sanders*, 668 F.3d at 1309.

There was no constructive amendment here.  The Second Superceding

Amended Indictment alleged a fraudulent scheme pursuant to which a 30% kickback would be paid to induce the pension fund to buy stock at an artificially inflated price. That is what the government argued to the jury that the evidence proved.

While the prosecutor mentioned "pump and dump" schemes and insider trading in his closing argument, the jury was never urged to convict Defendant on those theories. Finally, the District Court properly instructed the jury on the elements of mail fraud, securities fraud, and conspiracy.

Defendant maintains that his conviction for Count 7 must be set aside because Skwara's second transaction with the pension fund was outside the scope of Defendant's criminal agreement. Count 7 alleged securities fraud base on Skwara's second sale of USFM stock to the pension fund. However, Defendant asserts that due to Skwara's testimony that he and Defendant had no agreement for this transaction, the conviction must be reversed.

The evidence demonstrated that the scope of Defendant's agreement with Skwara was not limited to the first purchase of USFM stock in June, 2009. Skwara explained that when Defendant first approached him, he told Skwara that "this is an opportunity for both our companies to make some money and help our companies" and "indicated that if the pension fund liked the deal, that they could be a long-term investor in the company." Defendant provided the introduction of

Skwara to the undercover agents, and coordinated Skwara's travel to meet with them.  The jury could have understood this to mean that Defendant anticipated the pension fund's "long-term" investment in USFM stock, not a one-time transaction, and Defendant's continued involvement.  Accordingly, the Count 7 conviction need not be set aside.

Defendant maintains that cumulative errors mandate a new trial.  While Defendant asserts a number of errors, only two arguments merit discussion.  First, that the District Court allowed inadmissable hearsay testimony from FBI Agent Sputo.  Second, that government argued that Defendant was guilty because Skwara had pled guilty to the same offense.

According to Defendant, the District Court abused its discretion by allowing inadmissable hearsay testimony from FBI Agent Sputo that Defendant used corporate funds to pay for his homeowners' association, county club, son's apartment and other personal expenses.

Following a review of the record, we determine that Sputo's testimony was not improperly admitted.  Sputo testified that based on his review of bank records, Defendant had used corporate funds to pay for his homeowners' association, country club, son's apartment, and other personal expenses.  Such testimony was permissible for a lay witness consistent with Federal Rule of Evidence 701.  *See Agro Air Assocs., Inc. v. Houston Cas. Co.*, 128 F.3d 1452, 1456 (11th Cir. 1997)

(finding that, pursuant to Rule 701, a lay witness is entitled to testify about their "opinions or inferences" which may be helpful to give a clear understanding of the witnesses testimony).  Furthermore, Sputo was subject to cross-examination on this testimony, therefore "any objection to the testimony went to the weight of the evidence, not to its admissibility." *Id.*

Even assuming, *arguendo*, that this testimony was mistakenly admitted, an erroneous evidentiary ruling does not require reversal if the resulting error was harmless. "[A] non-constitutional error is harmless if, viewing the proceedings in their entirety, a court determines that the error did not affect the verdict, or had but very slight effect." *United States v. Arias*, 431 F.3d 1327, 1338 (11th Cir. 2005) (quotation omitted).  "Overwhelming evidence of guilt is one factor that may be considered in finding harmless error."  *United States v. Phaknikone*, 605 F.3d 1099, 1109–11 (11th Cir. 2010).  Therefore, even if we were to conclude that any of Sputo's testimony was inadmissible hearsay, the error would be harmless in light of the overwhelming evidence of mail and securities fraud presented at trial.

The government argued, according to Defendant, that Defendant was guilty because Skwara had pled guilty to doing the same.  The prosecutor compared Defendant's and Skwara's conduct, and reminded the jury that Skwara admitted that he had committed fraud.

"It is a well-accepted principle that 'evidence about the conviction of a

22

coconspirator is not admissible as substantive proof of the guilt of a defendant.'" *United States v. Mitchell*, 1 F.3d 235, 240 (4th Cir. 1993) (internal citation omitted). However, that did not occur in this case. We have reviewed the comments that Defendant finds objectionable, and conclude these statements, while possibly not advisable, were not erroneous and did not rise to the level of plain error.[3]

Tellingly, all but one of the prosecutor's alleged inappropriate comments occurred in the government's rebuttal argument. Prior to the rebuttal argument, defense counsel painted the picture of Defendant as a down on his luck business owner in need of cash was snared into this case by Epstein—an opportunistic cooperating witness for the government. Once Defendant unwittingly agreed to become involved in a sting operation, it was the government, not Defendant, who set the terms of the deal. In rebuttal, the prosecutor explained that both Skwara and Defendant made their respective decisions to become involved in the scheme, not the government. This was fair comment on the evidence.

There do not appear to have been any inappropriate comments by the prosecutor about Skwara's guilty plea. Nevertheless, Defendant cannot demonstrate plain error because he fails to show that the comments made in

---

[3]    No objections were raised before the District Court to any of these comments.

23

closing argument affected his substantial rights.  Indeed, the jury was instructed that thier decision should not be based on what the lawyers said, but only on facts they decided were true based on the evidence presented at trial.[4]

### B.  Sentencing Issues

Defendant argues that the District Court erred by improperly calculating the intended loss amount under U.S.S.G. § 2B1.1(b)(1)(E).  Under the Guidelines, promulgated by the Untied States Sentencing Commission, the amount of loss caused by a defendant's offense will provide a basis for an enhancement.  U.S.S.G. § 2B1.1(b)(1).  The reduction in value of equity securities resulting from the offense is one factor the sentencing court shall take into account when estimating loss.  U.S.S.G. § 2B1.1, cmt. (n.3)(C)(v)).  Moreover, the loss shall be reduced by the fair market value of the "collateral" provided by the defendant.  U.S.S.G. § 2B1.1, cmt. (n.3(E)(ii)).

The district court is required "to make independent findings establishing the factual basis for its Guidelines calculations."  *United States v. Hamaker*, 455 F.3d 1316, 1338 (11th Cir. 2006).  It may base these finding on "'among other things, evidence heard during trial, undisputed statements in the PSI, or evidence presented during the sentencing hearing.'"  *Id.* (quoting *United States v. Ndiaye*,

---

[4] Defendant also suggested that the District Court erred by failing to give the witness-accomplice guilty plea limiting instruction.  However, Defendant failed to request such an instruction, and the failure to give such an instruction was not plain error.

434 F.3d 1270, 1300 (11th Cir. 2006)). The burden of proof is on the government to establish "facts relevant to the loss calculation by a preponderance of the evidence." *Id.* The district court's loss calculation is "entitled to appropriate deference" and its "reasonable estimate . . . will be upheld on appeal." *United States v. Gupta*, 463 F.3d 1182, 1200 (11th Cir. 2006) (citations and quotations omitted). But the district court may not base its calculation on "mere speculation and the government bears the burden of supporting its loss calculation with reliable and specific evidence." *Id.* Fraudulent schemes come in a variety of forms, ranging from "theft-like fraud where the perpetrator intends to keep the entire amount fraudulently obtained," to "contract fraud where the perpetrator, while fraudulently obtaining the contract, intends to perform the contract and to cause no loss to the victim." *United States v. Orton*, 73 F.3d 331, 334 (11th Cir. 1996). The nature of the scheme, however, must be considered to determine "what method is to be used to calculate the harm caused or intended." *Id.* at 333.

Under the Guidelines, conduct relevant to sentencing includes all acts that a defendant "aided, abetted, [or] counseled." U.S.S.G § 1B1.3(a)(1)(A). It also includes "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity." U.S.S.G § 1B1.3(a)(1)(B). A defendant's conduct may result in sentencing accountability under more than one subsection. U.S.S.G § 1B1.3, cmt. (n.2(b)(1)). To determine a defendant's

25

liability for the acts of others pursuant to § 1B1.3(a)(1)(B), the district court "'must first make individualized findings concerning the scope of criminal activity undertaken by a particular defendant.'" *Hunter*, 323 F.3d at 1319 (quoting *United States v. Ismond*, 993 F.2d 1498, 1499 (11th Cir. 1993)).  Only upon making this finding of scope is the district court to determine reasonable foreseeability.  *Id.*  A conspirator's mere knowledge of the larger conspiracy and agreement to participate in a particular act does not necessarily amount to acquiescence in all of the acts of the criminal enterprise.  *Id.* at 1320.  However, a defendant is liable under § 1B1.3(a)(1)(B) when he is "fully aware of the objective of the conspiracy and . . . actively involved in recruiting investors to further the . . . scheme."  *McCrimmon*, 362 F.3d at 732.

The District Court did not err in the loss calculation.  Instead, it gave a reasonable estimate of the loss that accounted for the likely effect that the undisclosed fraud would have on the market value of Defendant's company stock. In this case, the District Court found that the Pension Plan would not have bought the stock at all in the absence of the fraud, and found that, in light of the fraud, the Pension Fund held stock that was essentially worthless.  Moreover, the District Court properly found Defendant responsible for both of his co-conspirator's transactions under the relevant-conduct principles of § 1B1.3.  Accordingly, we affirm as to this issue.

Secondly, Defendant maintains that the District Court improperly applied a two-level enhancement under U.S.S.G. § 3B1.3 for abuse of trust because Defendant had no relationship with the victims of the criminal transaction. Specifically, Defendant maintains it was improper for the District Court to apply a bright-line rule that it was an abuse of trust whenever a CEO commits a crime related to that CEO's company. Moreover, the conduct on which the conviction is based must be independent of the abuse of trust itself. But here, according to Defendant, paying a bribe was the basis both of the conviction and the enhancement.

Under the Guidelines, a two-level enhancement may be applied if a defendant "abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense." U.S.S.G. § 3B1.3. The enhancement "only applies when the victim conferred the trust." *United States v. Walker*, 490 F.3d 1282, 1300 (11th Cir. 2007). In the context of fraud, with its "[inherent] component of misplaced trust," a district court must not be "overly broad" in applying the enhancement. *Garrison*, 133 F.3d at 838 (citations and quotations omitted). Instead, the enhancement, should be applied in two circumstances: "where the defendant steals from his employer, using his position in the company to facilitate the offense," and "where a fiduciary or personal trust relationship exists with other entities, and the defendant takes

27

advantage of the relationship to perpetrate or conceal the offense." *Id.* at 837-38 (quotations omitted). In the fiduciary context, courts "must distinguish between those arms-length commercial relationships where trust is created by the defendant's personality or the victim's credulity, and relationships in which the victim's trust is based on defendant's position in the transaction." *Id.* at 838 (citation omitted).

The District Court properly found that an abuse-of-trust enhancement was justified in this case. Defendant abused his position as a fiduciary to his shareholders, and used that position to facilitate the commission of the offense. Accordingly, we affirm as to this issue.

### V. Conclusion

Based on the foregoing and our review of the record and the parties' briefs, we affirm Defendant's convictions and sentence.

**AFFIRMED.**